PEOPLE v. BUDARY

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—CODEFENDANTS—
SAME COUNSEL—NONCONFLICTING DEFENSES.

Representation of two codefendants at preliminary examination by the same appointed attorney is not reversible error, absent prejudice or a conflict of interest in the positions of the defendants, especially since Michigan's arraignment and preliminary examination proceedings do not usually constitute a critical stage of the proceedings at which counsel for the accused is required.

2. CRIMINAL LAW—PRELIMINARY EXAMINATION—CRITICAL STAGE.

Use of preliminary examination testimony for impeachment at trial is not such a special circumstance as to make the preliminary examination a critical stage of the proceedings since the defendant has a complete and adequate opportunity to confront and cross-examine the witness at trial.

3. CRIMINAL LAW—POLICE INFORMANT—RELIABILITY—IDENTITY.

Requirements of reliability and particularity of information given by police informer so that his identity need not be disclosed are met when police officer testified that informer had given reliable information before and that he described the defendant by name and address and related many details about the gang to which defendant belonged including a

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law §§ 313, 314, 319.
[3] 21 Am Jur 2d, Criminal Law § 332.
[4] 53 Am Jur, Trial § 670.
[5] 21 Am Jur 2d, Criminal Law § 356.

description of the getaway car and the address where the gang could probably be found.

4. CRIMINAL LAW—INSTRUCTIONS TO JURY—FAILURE TO OBJECT—STATUTES.

Defendant's failure to request jury instructions that preliminary examination testimony was to be used for impeachment and not as substantive evidence precludes his objecting to the court's instructions for the first time on appeal (CL 1948, § 768.29).

5. CRIMINAL LAW—WITNESSES—DEFENDANT TESTIFYING—INSTRUCTIONS TO JURY.

Precautionary instruction to jury, given without request, that defendant's failure to take the stand to testify should not in any sense be construed against him was appropriate and likely inured to the benefit of the defendant where a codefendant did take the witness stand and testified in his own behalf.

Appeal from Recorder's Court of Detroit, Gerald W. Groat, J. Submitted Division 1 January 12, 1970, at Detroit. (Docket No. 6,444.) Decided March 24, 1970.

Melvin Hugh Budary was convicted of robbery armed. Defendant appeals. Affirmed.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *William L. Cahalan*, Prosecuting Attorney, *Samuel J. Torina*, Chief Appellate Lawyer, and *Joseph C. Murphy*, Assistant Prosecuting Attorney, for the people.

*Raymond J. DeRyck* (*Dominic R. Carnovale*, of counsel), for defendant on appeal.

Before: DANHOF, P. J., and FITZGERALD and McGREGOR, JJ.

DANHOF, P. J. Defendant Budary and a codefendant, Howard Commons, were found guilty of robbery

armed by a jury on February 20, 1963, CLS 1961,
§ 750.529 (Stat Ann 1970 Cum Supp § 28.797). It
was the theory of the prosecution that Budary and
Commons, along with James Murphy and Robert
Richter, committed an armed robbery of a Food Fair
market in Detroit on December 4, 1961. Initially,
only Budary, Commons and Murphy were held for
trial, because Richter had left the state and had not
yet been apprehended.

Two preliminary examinations were held. The
first occurred on January 5, 1962, with Budary,
Commons and Murphy as defendants. Attorney
Gregory Pillon represented Commons and Murphy.
There was no appearance by an attorney for Bu-
dary. However, near the conclusion of the exam-
ination attorney Pillon made a motion that the
case be dismissed as to Commons and Budary alleg-
ing lack of probable cause to believe that the two
men were connected with the holdup. The court,
however, decided to bind over all three defendants
for trial on the charge of robbery armed.

On March 20, 1962, James Murphy pleaded guilty
and was later sent to prison. Thereafter, on March
26, 1962, the prosecution moved to dismiss the case
against Budary and Commons. On July 15, 1962,
Budary and Commons were rearrested for the rob-
bery and arraigned on July 16, 1962. A second pre-
liminary examination was held on July 19, 1962,
before a different judge than was involved in the
first preliminary examination. At this second pre-
liminary examination attorney Pillon again repre-
sented codefendant Howard Commons. There was
a brief colloquy between the court, Budary and
Pillon wherein the court asked Budary why he
didn't have a lawyer and he answered that he didn't
have the funds. The court then asked attorney
Pillon if there was any conflict that he could antici-

pate and, when Mr. Pillon answered none that he could think of, the court said, "You represent both of them for the examination only."

. By this time Robert Richter had been captured in Chicago, Illinois, and returned to Detroit. He also pleaded guilty. At the second preliminary examination, he testified for the people, and it is the admissibility of that testimony at trial which is questioned in this appeal.

At the trial which commenced February 14, 1963, defendant was represented by attorney Ted Vincent, appointed by the court, and the codefendant was represented by Mr. Pillon. The case was tried and decided before the creation of this Court. On October 19, 1967, defendant filed a motion for leave to file a delayed motion for new trial, which was denied January 9, 1969. This Court granted an application for delayed appeal on March 10, 1969.

Defendant argues that the summary appointment of codefendant's counsel to represent defendant at the second preliminary examination, without the record showing an affirmative determination by the examining magistrate that the defendant intelligently chose to be represented by the same counsel, and that his decision was not governed by poverty and lack of information on the availability of assigned counsel to represent him alone, constituted reversible error.

In *People* v. *Dockery* (1969), 20 Mich App 201, this Court held that absent prejudice to the defendant this Court would not reverse because indigent codefendants were represented at trial by the same appointed counsel. The Court's opinion indicated that this was not the most desirable method of procedure and that, if there was any conflict of interest in the positions of the codefendants, the result would be different. The *Dockery* case related to

the trial itself. In the instant case we have no question about the actual trial where codefendants were represented by separate counsel. With regard to the preliminary examination, as previously stated, the court did ask attorney Pillon if he anticipated any conflict and received a negative response. Thereafter attorney Pillon throughout the examination made many objections and cross-examined the people's witnesses vigorously. With regard to witness Richter's testimony there are ten pages of vigorous cross-examination by Pillon. The fact that near the end of the examination Mr. Pillon indicated that he didn't represent defendant Budary does not alter the fact that he then went on to represent him by contending that Budary wasn't guilty of the crime inasmuch as the only connection between him and it was that he was some eight blocks away during its occurrence. Mr. Pillon's remark does not alter the fact that the court at the beginning of the examination did appoint him to represent Budary, and he did in fact do so in a competent way.

However, regardless of whether attorney Pillon's representation of the defendant was effective or not, the court in *Lundberg* v. *Buchkoe* (CA 6, 1968), 389 F2d 154, held that Michigan's arraignment and preliminary examination proceedings did not constitute a critical stage of the proceedings at which counsel for the accused was required. By way of *dictum* the court said there might be special circumstances in some cases that would suggest that the proceedings were critical and therefore required counsel. However, counsel was in fact appointed for defendant Budary, albeit not in the most exemplary fashion.

Defendant then attempts to buttress his position that he was without effective counsel at a critical

stage in the criminal judicial process by stating that actual prejudice is readily discernible. In support of this defendant argues that the critical testimony at the preliminary examination which resulted in defendant's being bound over for trial was that of Robert Richter, who upon his capture and return from Chicago pleaded guilty of the same criminal act charged against the defendant and who at the preliminary examination implicated Budary in the robbery. Yet at the trial when Richter was called as a witness for the people, he firmly denied that Budary had any connection with the crime. The prosecution then proceeded to read portions of Richter's testimony at the preliminary examination before the jury and over the defense counsel's objections, and this testimony was particularly damaging to Budary's defense. Defendant then says that this testimony was taken at the preliminary examination where Budary did not have his own counsel and where he was denied effective confrontation and cross-examination relative to self-interest, duress or any number of reasons for this damaging testimony.

Defendant cites *Pointer* v. *Texas* (1965), 380 US 400 (85 S Ct 1065; 13 L Ed 2d 923) and *People* v. *Chapman* (1968), 380 Mich 74, in support of his position that preliminary examination testimony cannot be admitted at the trial if defendant was not represented by counsel at the preliminary examination. Both cases are readily distinguishable from the instant case because no attempt was made to appoint counsel at the preliminary examination in those cases, whereas in this case Pillon was appointed. More significant, however, is the fact that neither of the cases involved use of preliminary examination testimony for the purposes of impeachment as does the instant case. That is true also of

*People* v. *Gibbs* (1967), 255 Cal App 2d 739 (63 Cal Rptr 471). All of them concerned the admission of preliminary examination testimony as substantive evidence because the witness at the preliminary examination was unavailable to testify at the trial. The point made by the courts was that when defendant wasn't represented by counsel at the preliminary examination or his attorney did not have adequate time to prepare for cross-examination, then defendant had been denied his constitutional right to confront the witnesses against him which is primarily for the purpose of cross-examination, and that, therefore, their testimony could not be used as substantive evidence at the trial. In other words, the people had to bring in the witness at the trial so that the defense counsel had at least one opportunity to cross-examine the witnesses against the defendant. In the present case there is no problem of the defendant not having a complete and adequate opportunity to confront the witness and to cross-examine the witness, since Richter took the stand at the trial and the preliminary examination testimony was used only to impeach his testimony at the trial. Clearly this case does not present the "special circumstances" that the court in the *Lundberg* case had in mind.

Defendant's second argument is that the testimony of the police officer relative to the information given by the allegedly reliable informant did not satisfy the requirements of reliability and particularity of information sufficiently to authorize the trial judge to have denied disclosure of the informant's identity, and that the search incidental to defendant's arrest consequently violated the Fourth and Fourteenth Amendments of the United States Constitution and the evidence obtained thereby was inadmissible and should have been excluded.

Defendant cites as authority for his position *Beck*
v. *Ohio* (1964), 379 US 89 (85 S Ct 223; 13 L Ed 2d
142) wherein the Court said:

"All that the trial court was told in this case was
that the officers knew what the petitioner looked
like and knew that he had a previous record of
arrests or convictions for violations of the clearing
house law. Beyond that, the arresting officer who
testified said no more than that someone (he did
not say who) had told him something (he did not
say what) about the petitioner. We do not hold
that the officer's knowledge of the petitioner's phys-
ical appearance and previous record was either in-
admissible or entirely irrelevant upon the issue of
probable cause. (Citing *Brinegar* v. *United States*
[1949], 338 US 160 [69 S Ct 1302; 93 L Ed 1879]).
But to hold that knowledge of either or both of
these facts constituted probable cause would be to
hold that anyone with a previous criminal record
could be arrested at will.

"It is possible that an informer did in fact relate
information to the police officer in this case which
constituted probable cause for the petitioner's ar-
rest. But when the constitutional validity of that
arrest was challenged, it was incumbent upon the
prosecution to show with considerably moore speci-
ficity than was shown in this case what the informer
actually said, and why the officer thought the infor-
mation was credible."

The instant case is clearly distinguishable from
the facts in the *Beck* case. The record shows that
a Detroit police officer testified on direct examina-
tion as follows:

"*Q.* Was this person you talked to on the third
day of December, 1961, a confidential informer?

"*A.* He was.

"*Q.* Did he give you certain information on this
date?

"*A.* Yes, sir.

"*Q.* And has he given you information, or had he given you information in the past?

"*A.* Yes.

"*Q.* Had that information turned out to be reliable?

"*A.* Yes."

On a special record out of the presence of the jury the direct examination was continued, part of which follows:

"*Q.* Is this man still a valuable informer to the Detroit Police Department?

"*A.* Yes.

"*Q.* Would it be injurious to the Detroit Police Department to ask this man to disclose his name at this time?

"*A.* It would, sir.

"*Q.* Please state the information given to you by this man.

"*A.* I was told that there was a gang consisting of three men who specialized in holdups of super markets.

"*Q.* Go ahead.

"*A.* They were going to hold up a supermarket this following week. The first man was described as the driver who lived at the Wardcliff Hotel in room 404. His name was Melvin Budary. He had already stolen the car and had it hidden to use in the holdup. Number two man was described as a white man, 30, 6 foot tall, 150 pounds, dark brown hair, light jacket, which he always wears. He was also described as thin, broad shoulders, clean-cut looking, young clean-cut appearance. He lived at the Leroy Hotel on Brainard, and was going with a waitress from Harry's Bar on Michigan, and a waitress from Fox's Bar on Michigan, called Mitzie. Mitzie I knew to be Mary Shay. Number three man was described as a white man who always wore a blue jacket and also goes with the waitresses and the above man. He is supposedly staying with the

number two man at the Leroy Hotel on occasions. The guns to be used on the holdup were reported to be at the waitress' apartment on Brainard. Also Mitzie lived at 84 Sproat, apartment number 202, and these people congregated there and sometimes stayed there. That was the original information that I received. I told the informer to keep digging and keep in constant contact with me, which was done. Monday, December 4, I was again contacted. We were on the street looking for the suspects. I was contacted and told there was going to be four men on the holdup. The car they were going to use was a white '61 Pontiac or Oldsmobile, that the super market was on the west side. The exact location was not known. Later, as we were still on the street, at approximately 6:50 we heard a radio run, holdup, at 16520 West Warren, Food Fair Market, a robbery. This fitted in with the information we had previously. Then at 7:32 as I recall a teletype was issued describing two of the men and stating they had escaped in a '60 white Olds or Pontiac vehicle. Contact was again made with the informer several times that evening, and we learned Melvin Budary was one of the men and a man named Bob and the number two man we learned was Richter. The number three man we got a description on as being young, clean-cut, handsome, with curly hair, blond curly hair. We also learned that one of these men supposedly owned a white-blue Falcon vehicle. At approximately 10:30 or so in the evening of the fourth of December, 1961, we received information that it was believed the participants of this holdup were at 84 Sproat. I then gave that message to Sergeant Collins, and told him as far as I was concerned the people were in there now and he could arrest them at his own discretion, or as soon as he felt it feasible. At approximately 11 o'clock I left the scene when Sergeant Collins arrived. As I recollect, that was the extent of the information."

The foregoing quotations from the trial transcript show clearly what the informer actually said and why the officer thought the information was credible. The informer had given reliable information before, he described the defendant by name and address, he related many specific details about the holdup gang including a description of the get-away car and the address where they could probably be found. We find no merit in defendant's argument that the information given by the informer did not satisfy the requirements of reliability and particularity required by *Beck* v. *Ohio, supra.*

Defendant next argues that the trial court erred in allowing the prosecution to read portions of Robert Richter's testimony at defendant's preliminary examination in front of the jury for the purpose of impeaching Richter's testimony without informing the jury that it could not consider Richter's examination testimony as substantive evidence. Defense counsel did not request such a charge and no exception was taken to the trial court's failure to give such an instruction. It may have been an oversight on defense counsel's part, or it may have been trial strategy not to remind the jury of the testimony at the preliminary examination since that was highly prejudicial to defendant.

The question for this Court is: should it reverse when defense counsel has not requested specific instructions limiting preliminary examination testimony to impeachment purposes and has not objected to the court's instruction as given. CL 1948, § 768.29 (Stat Ann 1954 Rev § 28.1052) states in part:

"The failure of the court to instruct on any point of law shall not be ground for setting aside the verdict of the jury unless such instruction is requested by the accused."

This Court relied on that statute in refusing to reverse in the cases of *People* v. *George Baker* (1967), 7 Mich App 7, and *People* v. *Pope* (1967), 8 Mich App 231. The *Baker* case concerned the introduction of the defendant's criminal record for impeachment purposes and the *Pope* case concerned the impeachment of a witness by prior verbal statements.

However, in *People* v. *Eagger* (1966), 4 Mich App 449, and *People* v. *Danles* (1969), 15 Mich App 510, this Court held that it was reversible error to fail to give an instruction that the out-of-court statements which were not under oath and were not in the presence of the defendant could be used only for impeachment purposes and not as substantive evidence even though such an instruction was not requested by the defendant. Reliance was placed on *People* v. *Durkee* (1963), 369 Mich 618, in arriving at this result. Those three cases are factually distinguishable since in the present case preliminary examination testimony is involved which is sworn under oath and given in the presence of the defendant who has a right to confront the witnesses and to cross-examine them. This distinction was not spelled out in any of the three opinions, but it wasn't necessary since preliminary examination testimony was not being challenged. However, the court in the *Durkee* case may well have had this in mind when it said at p 626 with reference to the out-of-court hospital statement:

"even though the statement was not made under oath and not made in the presence of defendant."

In that case the preliminary examination testimony indicated that the witness did not remember and she also stated at the trial that she did not remember so the preliminary examination testimony

and trial testimony agreed, and the issue was whether the out-of-court hospital statement could be used to impeach her.

However, in *People* v. *Virgil Brown* (1969), 15 Mich App 600, the defense counsel did object to the use of the preliminary examination testimony and requested the court to include in its charge to the jury an instruction that the questions put to the witness by the prosecution were not evidence and could not be considered by them in their deliberation. The court, aside from a remark to the prosecutor not to stray beyond legitimate impeachment, did not instruct the jury either during the trial or in its charge that use of the preliminary examination testimony was only for impeachment purposes and could not be considered as substantive evidence. That case is of course distinguishable in that the defense counsel did object and did request a specific limiting instruction which the trial court refused. There is no question but what that constitutes reversible error. The court went on to say that failure to give such a limiting instruction has been held to be reversible error irrespective of whether such an instruction was requested, citing the *Eagger* case. However, as previously stated that case dealt with an out-of-court statement and did not involve preliminary examination testimony which is given under oath and in the presence of defendant. Regardless of this factual distinction, however, we do not think that the *Brown* case is controlling as it was decided some six years after the trial in the instant case. We hold that this case is governed by CL 1948, § 768.29 (Stat Ann 1954 Rev § 28.1052). Defendant having failed to request the instruction will not now be granted a new trial because of the court's failure to give the instruction.

Defendant also contends that the lower court erred in not declaring a mistrial when the prosecuting attorney made reference to a "convicted felon" in his rebuttal statement, since defendant had elected his constitutional right to remain silent.

The remark complained of occurred during the prosecutor's closing argument to the jury as he was summarizing the case against codefendant Howard Commons. The reference to Howard Commons being with a convicted felon at a bar downtown was not focused directly on defendant. The courts of this state have always been extremely sensitive to the merest likelihood that improper mention of an accused's past criminal record might prejudice the proceedings against him. See *People* v. *Greenway* (1962), 365 Mich 547, and *People* v. *Camel* (1968), 11 Mich App 219. However, the record discloses that defendant's attorney did not move for a mistrial, and we hold that his objections to so marginal a remark are therefore waived.

Finally the defendant argues that the trial court erred in its charge to the jury when the judge, *sua sponte,* stated as follows:

"Now in this case the defendant, Melvin Hugh Budary, has not taken the stand.

"Under our law the defendant may take the stand or elect not to do so. When he does not take the stand in his behalf counsel have no right to comment on that, nor has the court any right to comment about it, and you have no right to take that into consideration in any manner in arriving at your verdict. It is his right to take the stand, or he may elect not to do so, as he shall choose, and you are not in any sense to construe that against him."

Defendant urges that due process demands nothing short of silence regarding defendant's exercise of his constitutional right, unless such a charge is requested by the defendant.

Defense counsel did not advise the trial judge that he wanted no instruction on the defendant's failure to take the stand, nor did he object to the instruction after it was given. Furthermore, the co-defendant, Howard Commons, took the stand in his own behalf and under such circumstances it would appear that a precautionary instruction in this regard was appropriate and likely inured to the benefit of the defendant. United States Supreme Court cases which prohibit adverse comment regarding the defendant's failure to take the stand are not in point where, as here, the trial court clearly instructed the jury that they could not consider the defendant's failure to testify in any way.

Affirmed.

All concurred.