Argued and submitted April 29, affirmed August 3,.
reconsideration denied September 17,
petition for review denied October 27, 1981 (291 Or 893)

## STATE OF OREGON,
### *Respondent,*
*v.*
## THOMAS A. HERMACH,
### *Appellant.*

(No. 10-80-01826, CA 19457)

632 P2d 466

Wayne E. Allen, Eugene, argued the cause and filed the brief for appellant.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were, Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

## YOUNG, J.

Defendant was convicted, on stipulated facts, of Unlawful Possession of a Controlled Substance. ORS 475.992(4). On appeal, he assigns as error the denial of his motion to suppress evidence seized during execution of a search warrant. Probable cause to issue the warrant was supplied by the affidavit of James Michaud, a police officer with the Eugene Police Department. The affidavit was based primarily on hearsay statements given by a named informant. The ultimate issue on appeal is whether the informant's veracity was sufficiently demonstrated to justify issuance of the warrant. We hold it was and affirm.

Officer Michaud's affidavit, which incorporated the affidavit of Officer Randall, supplies the factual background and substantive basis for this appeal. The affidavits, in pertinent part, are set out in the margin.[1]

---

[1]   "I, James E. Michaud, being first duly sworn on oath, hereby depose and say:

"That I am a police officer with the Eugene Police Department and have been so employed for over three years. * * *

"That on November 16, 1979, I was informed by William Randall, a Police Officer for the City of Eugene, of all the information contained in his affidavit of November 16, 1979, for a search warrant for cocaine. Officer Randall's affidavit is attached to this affidavit and is herein incorporated by reference as Exhibit A.

"That subsequent to the arrest of a person identified as James Barton, referred to in Exhibit A, I had occasion to speak with James Barton at the Eugene Police Department and determined that his true name is, in fact, Kenneth Reuben Kelsey. During the interview I was provided with the following information by Kelsey.

"That on November 14, 1979, Kenneth Reuben Kelsey arrived in Eugene from Los Angeles in possession of the cocaine which is the subject of Exhibit A. Kelsey stayed the evening of November 14, 1979, in a Eugene motel.

"That on November 15, 1979, Kelsey met with a person known only to him as 'Tom' at Biederbeck's Lounge at 259 East 5th Street, Eugene, Lane County, Oregon; at approximately 6:00 p.m. Kelsey attempted to sell a quantity of cocaine to Tom and displayed some of the vials of cocaine that he had in his possession. Tom indicated that he was not interested in Kelsey's cocaine and requested Kelsey to accompany Tom to his residence to see 'some real' cocaine. Kelsey and Tom departed Biederbeck's Lounge at approximately 7:00 p.m. and proceeded to 11th Avenue in Eugene. Kelsey and Tom then proceeded westbound on 11th to an Arco Station in a country setting. At this point they turned left and proceeded in a southerly direction for approximately two and one-half miles, made several more turns and arrived at a residence.

"Shortly after Kelsey and Tom arrived at the residence, an individual known to Kelsey only as 'Rick' arrived carrying a brown paper grocery-type bag. Rick and Tom then left Kelsey in one room and proceeded to another room where they remained for approximately five minutes. Rick and Tom then returned to the room in which Kelsey was waiting and displayed to Kelsey approximately one-quarter ounce of a white powder that they claimed to be cocaine. Some of the white powder was then placed on a mirror in the living room. Kelsey, Rick and Tom then 'snorted' the white powder on the mirror. This was done by sniffing the powder through a straw. Kelsey indicated that he has used cocaine on numerous occasions, and from his experience determined that the white powder he was sniffing with Rick and Tom was high quality cocaine. Rick then departed the residence without the brown paper bag.

"Shortly after Rick's departure, Tom took Kelsey into another room where Tom showed Kelsey a quantity of cocaine which Kelsey believed to be approximately two to two and one-half pounds. Tom and Kelsey then returned to the living room where they snorted more cocaine. During this period of time, Tom made flight reservations for Kelsey for a flight to Los Angeles. Tom also discussed with Kelsey his desires that Kelsey return to Los Angeles and locate a buyer for Tom's cocaine. Tom indicated that he wanted a buyer for approximately five pounds of cocaine. At approximately 10:00 p.m. Kelsey and Tom departed the residence and returned to Biederbeck's Lounge, arriving at the lounge at approximately 10:30 p.m. Shortly thereafter Tom departed the area of the lounge, leaving Kelsey there.

"During my interview with Kelsey, Kelsey provided me with telephone number 683-5073 and indicated that this was Tom's telephone number. A check with Pacific Northwest Bell Telephone reveals that this number is listed to a Fernando Gomez at 86764 Pine Grove Road, Eugene, Lane County, Oregon. I know from my experience as a police officer that this address can be reached by traveling westbound on 11th, then southbound on Crow Road to Pine Grove Road. I also know that there is an Arco Station at the intersection of West 11th and Crow Road. On November 16, 1979, Kelsey accompanied me to a residence just off Pine Grove Road and identified that residence as the one to which Tom had taken him the evening of November 15, 1979, and as the residence in which he observed the two to two and one-half pounds of cocaine. I observed this residence to be a tri-level, wood-frame dwelling, beige, reddish-brown and white in color located as follows: From Crow road, proceed south on Pine Grove Road for approximately .25 miles to a gravel road. Proceed westbound on the gravel road .15 miles to the above-described premises. I was unable to see a house number but know this to be the 86 hundred block area.

The attached affidavit of officer Randall further provided:

"That on November 16, 1979, at approximately 8:00 a.m., I was on duty at Mahlon Sweet Airport in Eugene, Lane County, Oregon, and was working in the security screening area of the Mahlon Sweet Airport. This is the area where all passengers must enter prior to boarding any commercial aircraft. While on duty in the security area, I was summoned by private security personnel also on duty in the security screening area of the airport to assist them.

"The security screening room contains a conveyor belt which passes through an x-ray machine to determine whether any contraband items are contained in any luggage that passes through the x-ray machine.

Based upon the affidavits, a search warrant was issued for defendant's residence. At trial the parties stipulated that the search produced evidence that defendant unlawfully possessed cocaine.

I.

Defendant moved to suppress the evidence and simultaneously filed a motion to controvert the allegations of Michaud's affidavit. ORS 133.693. To support both motions, defendant relied on a police report prepared by Michaud which, defendant argues, generally gave a less favorable impression of Michaud's informant as a "truth speaker" than did the affidavit. In particular, the report indicated that the informant, Kelsey, gave a false name and address when he was arrested at the airport, that he

"On November 16, 1979, I was summoned by Joyce Smith of the airport private security force, who indicated to me that two white boxes approximately 10 inches by 5 inches had just passed through the x-ray machine in the security room. The airport security personnel, including Joyce Smith, are not police officers and are employed by a private firm that is under contract to the airport. She told me that she opened one of the boxes and examined the contents of the box. She showed me the box that she opened, and I could see that the box contained numerous glass vials containing a white powder which I recognized as being similar to a controlled substance both in color and in texture. I examined the contents of a glass vial taken from the box, and while doing so I spoke with James Barton, who was a passenger in the security screening room that claimed the boxes and vials as his own. I asked him what was in the glass vials and he did not answer my questions. I continued to inquire as to the nature of the contents of the glass vials, and he refused to respond to my questions. He attempted to grab the boxes but I held onto them and told him that I could not let him on the plane with those containers until I had identified the contents of them. He continued to tug at the box that I had in my possession and I told him that until I could identify the substances further he should remain seated in the security screening room of the airport. At that point he picked up some of his belongings and left the boxes behind and he exited the security screening room through the entrance door to that screening room.

"Joyce Smith also told me that she asked James Barton what was in the box and he told her that it was some type of chemical.

"The box that was opened by the airport personnel was transported to the Eugene Police Department. When the box arrived at the Eugene Police Department in my custody, Eugene Police officer Rick Allison performed a field narcotics test on the contents of one of the vials that came from inside the box. The field test for the presence of controlled substances revealed positive for the presence of cocaine.

"* * * * *"

resisted arrest, that he initially gave an incomplete and possibly different account of his visit to Eugene and that he was wanted by federal authorities in California. Defendant argued at the hearing, and argues now on appeal, that these supplemental facts should be taken into account in determining whether the affiant's information was from a reliable source.

■■    A motion to controvert tests only the good faith, accuracy and truthfulness *of the affiant* as to the evidence presented to the authority which issued the warrant. ORS 133.693(2); *State v. Libermann,* 51 Or App 345, 625 P2d 678 (1981); *State v. Coatney,* 44 Or App 13, 604 P2d 1269, *rev den* (1980). The facts in Michaud's police report supplement but do not in any way contradict the evidence presented in the affidavit. The police report, therefore, does not test the accuracy or truthfulness of the affiant. Defendant's basic contention is that Michaud was not completely forthright with respect to his informant's character and that the magistrate consequently had incomplete information from which to determine the informant's veracity. The challenge is to the affiant's good faith.

The trial court denied the motion to controvert and in essence ruled that defendant failed to prove that Michaud had not acted in good faith. The first question is whether, in light of the trial court's ruling, the controverting evidence produced by defendant should still be considered in determining whether suppression should be ordered.

Defendant relies on *State v. Hughes,* 20 Or App 493, 532 P2d 818 (1975), where the issue was whether probable cause had been established before the magistrate who issued the warrant. We said:

> "* * * To decide this question we must necessarily limit the inquiry to the information that was before the magistrate, that is, the contents of the affidavit. The testimony at the suppression hearing *can detract* from the affidavit to the extent that it proves inaccuracies; but the testimony cannot add to the affidavit because information known to an affiant but not communicated to the issuing magistrate cannot be the basis of a probable-cause determination." (Citations omitted; emphasis supplied.) 20 Or App at 497-98.

The requirement that detracting evidence be considered derives from *State v. McManus,* 267 Or 238, 517 P2d 250 (1973). In that case the affiant, a police officer, stated in his affidavit that he had observed defendant hand "what appeared to be a baggie of marijuana" to another person. At the suppression hearing the officer admitted that he could not see the contents of the container and that he was not certain what was passed. The court held:

> "* * * [A] statement in an affidavit supporting a warrant must be removed if it is intentionally false. Negligent statements in an affidavit need not be excised, but we require that the entire supporting affidavit be re-examined in light of the controverting statements given at the hearing. Would the magistrate as a reasonable, cautious man have issued the warrant if he had known the correct facts and drawn the correct inferences in arriving at probable cause when he issued the warrant? The officer might have thought he was acting in good faith, but he admitted to overstating the correct facts in his affidavit and therefore disrupted the normal inference-drawing process. As stated in *Beck v. Ohio,* 379 US 89, 97, 85 S Ct 223, 13 L Ed 2d 142 (1964), 'If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects," only in the discretion of the police.'"

As in *McManus,* what we are concerned with here is the integrity of the inference drawing process by which the magistrate is to decide *independently* whether there are sufficient grounds for issuing a warrant. When probable cause is supplied by a hearsay source, the magistrate's independent determination of probable cause depends on his ability to determine independently that the informant is trustworthy and should be believed. That process may be interfered with not only by inaccurate information, but also by the affiant's failure, whether intentional or negligent, to fully disclose facts pertaining to the informant's veracity. That would include facts relating to both the informant's credibility, i.e., his reputation and demonstrated history of honesty and integrity, and the reliability of his information, i.e., circumstances assuring trustworthiness on the particular occasion. *State v. Montigue,* 288 Or 359, 362-63, 605 P2d 656 (1980).

■ If, by failure to supply enough information, the magistrate's inference drawing process is disrupted, a remedy is required. ORS 133.693(2) directs that a defendant may not question the good faith of the affiant in presenting evidence to the magistrate, unless the defendant first demonstrates a "substantial basis for questioning such good faith * * *." We hold that where the defendant meets this threshold burden and introduces evidence showing that the affiant failed to make a full disclosure of information known to him, "the entire supporting affidavit [should] be re-examined in light of the controverting statements given at the hearing." *State v. McManus, supra.*

## II

The test established by *Aguilar v. Texas,* 378 US 108, 84 S Ct 1509, 12 L Ed 723 (1964), and *Spinelli v. United States,* 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969), to be applied in determining the sufficiency of an affidavit stating facts supplied by an informant is:

> "(1) whether the affidavit sets forth the informant's 'basis of knowledge' and (2) whether the affidavit sets forth facts showing the informant's 'veracity' by indicating either that the informant is credible or that his information is reliable." (Citations omitted.) *State v. Carlile,* 290 Or 161, 164, 619 P2d 1280 (1980).

The question here is whether the informant's veracity was demonstrated.

In *State v. Carlile, supra,* the court took consolidated review of three cases, all of which involved search warrants based on information supplied by named, but criminally involved, informants. In all three cases, the court identified the naming of the informants and their having made declarations against penal interest as factors indicating their information was reliable. The search warrant pertaining to defendant Carlile's residence was upheld because the police had also partially corroborated the informant's information. There was no corroboration of the information leading to the arrest of the other defendants. As to them, the court reached a different result, saying:

> "* * * [T]he affidavit provided no assurance either that the informant was inherently credible or that her information was reliable. The fact that she was named and that

she had made an admission against her penal interest is an insufficient guarantee of reliability where no partial police corroboration of the information was made." 290 Or at 168.

■        In this case the informant was both named and made declarations against his penal interest in the affidavit (by admitting that he ingested and attempted to sell cocaine). There was also police corroboration. Kelsey supplied Michaud with a telephone number and described the route to defendant's residence. The address obtained from the phone company together with Kelsey's description of the route substantially verified that he actually had been to defendant's house.

■        Defendant argues that the corroboration must relate to the alleged criminal activity. Judge Moylan gives the following explanation of the relevance of corroboration to analysis of an informant's veracity:

> "When independent police observations have verified part of the story told by an informant, that corroboration lends credence to the remaining unverified portion of the story by demonstrating that the informant has, to the extent tested, spoken truly. The verification helps to demonstrate his 'credibility.' Present good performance shows him to be probably 'credible' just as surely as does past good performance." Moylan, "Hearsay and Probable Cause: An Aguilar and Spinelli Primer," 24 Mercer L Rev 741, 779 (1974).

Police corroboration which does not directly relate to the circumstances establishing probable cause is as demonstrative of "present good performance" and as relevant to establishing the informant's veracity as is corroboration of the criminal activity itself.

■        We must, however, still consider the facts relating to veracity set forth in Michaud's police report. The report and affidavit together reveal that the informant, Kelsey, was from out of town, that he traveled to Eugene with a purpose to sell cocaine, failed to meet his buyer and, after resisting, was arrested at the airport when he attempted to leave Eugene with the cocaine. Kelsey initially gave a false name and address but thereafter gave his real name and informed Michaud that he was wanted by federal

authorities. Kelsey also gave a general account of his activities during his stay in Eugene; he apparently later gave a second account which included his having met defendant at the lounge. We find nothing inconsistent in the two accounts. Kelsey's activities with defendant supplement but do not contradict the substance of the first account. While some of the facts contained in the report tend to detract from the informant's character as a "truth speaker," others indicate that, when confronted, Kelsey decided to come clean. He freely gave Michaud his real name and said he was wanted by federal authorities. Taken as a whole, these facts do not detract from the indicia of veracity contained in the affidavit alone.

The affidavit supplied a sufficient basis for the magistrate's independent determination of probable cause, and, because the controverting evidence was not meaningfully detracting, the motion to suppress was properly denied.

Affirmed.