**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0387n.06

**No. 09-6363**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MICHAEL MARTIN, | ) | **FILED**<br>*Jun 07, 2011*<br>LEONARD GREEN, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| JOSEPH SCHUTZMAN; DAN | ) | EASTERN DISTRICT OF KENTUCKY |
| GOODENOUGH, in their Individual and | ) | |
| Official Capacities, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, Chief Judge; ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. City Councilman Michael Martin and Detective Joseph Schutzman did not get along. Each launched an investigation into the other's alleged misconduct, but only Martin was arrested and charged (with forgery). After the prosecutor dropped the charges, Martin sued Schutzman and Police Chief Dan Goodenough in federal court. Because a quarrel with the police does not insulate a citizen—or a local official—from prosecution where probable cause otherwise exists, we affirm the award of summary judgment to the defendants.

I.

Schutzman had two jobs: He was a detective and a building inspector. When someone told Martin in 2005 that Schutzman was billing more than thirty hours per week for inspections, Martin

suspected that he might be conducting the inspections while on the clock working as a detective for the City of Villa Hills, Kentucky. Schutzman grew angry when Martin investigated the matter and threatened to sue Martin's sister who had become involved. When the issue reached the mayor, however, nothing came of it.

Meanwhile, Martin's mother had died, and he took on responsibility for administering her estate. He paid off her debts (just under $30,000) out of his own pocket and the Hamilton County (Ohio) Probate Court relieved the estate from formal administration. For some time, Martin's estranged father did not learn that his ex-wife had died, and as a result he did not question the garnishment of his social security payments in satisfaction of a child-support arrearage judgment she had won against him. When he learned that his ex-wife had died, he contacted Jeffrey Startzman, assistant director of the Hamilton County Department of Job and Family Services, who agreed the payments should have stopped upon her death. Startzman contacted the county court, which eventually placed "the arrearage in abeyance." R.18 at 13–14. He also subpoenaed bank records and learned that Martin had been endorsing the checks and had deposited $4,731 into his personal bank account. Startzman forwarded this information to the Villa Hills Police Department.

Startzman's report landed on the desk of Police Chief Dan Goodenough, who referred it to Villa Hills' only detective: Joseph Schutzman. Schutzman reviewed the materials and called Martin in for an interview. When confronted with this information, Martin—who had signed the checks, "Michael A. Martin, POA,"—explained:

> I know now, after talking to counsel and stuff, power of attorney stops [at death]. Didn't quite know that then. But I'm also the executor of her estate. . . . I thought that since there was a judgment against him, that would be part of mom's estate, so I continued . . . to cash them. I'm guessing [that] is what happened.

R.17, Ex. C, at 4–5. After the interview, Detective Schutzman filed a report on what he characterized as a "theft and fraud case," R.17, Ex.A, at 1, and forwarded it to the Kenton County prosecutor, who charged Martin with second degree forgery, *see* Ky. Rev. Stat. § 516.030.

Martin hired an estate lawyer who reopened the probate proceedings and filed a list of the debts Martin had paid. He also asked the court to clarify that Martin's father was required to continue paying his child-support arrearage to the mother's estate. The probate court ordered that the arrearage judgment "be sold" and that all remaining assets in the estate "be reimbursed to . . . Martin." R.1, Ex. C, at 1. When the Kenton County District Court learned about the order, it dismissed the forgery charges.

Martin sued Schutzman and Goodenough in federal court, bringing claims of false arrest and retaliatory and malicious prosecution. The district court granted summary judgment for the defendants, and Martin appealed.

## II.

The parties agree that each of Martin's claims requires that he prove a lack of probable cause, and so do we, *see Hartman v. Moore*, 547 U.S. 250, 252 (2006) (retaliatory prosecution); *Kennedy v. City of Villa Hills*, 635 F.3d 210, 218 (6th Cir. 2011) (false arrest); *Fox v. DeSoto*, 489 F.3d 227,

237 (6th Cir. 2007) (malicious prosecution). That means the defendants win if, at the relevant times, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Martin] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Under Kentucky law, "[a] person is guilty of forgery in the second degree when, [1] with intent to defraud, deceive or injure another, [2] he falsely makes, completes or alters a written instrument which is or purports to be . . . [a] commercial instrument." Ky. Rev. Stat. § 516.030(1)(a). Martin does not deny the existence of the second element of the crime—that he "falsely" endorsed the checks, as his power of attorney ceased when his mother died. He focuses instead on the state-of-mind requirement, claiming there was no reason to think he "intended to defraud the other beneficiaries of [the] estate, his siblings." Martin Br. at 38.

Martin is barking up the wrong tree. The police had a sufficient basis to suspect that Martin intended to deceive his father, not his siblings, as the father had continued making payments for years after his ex-wife's death unaware that Martin was receiving them. When Martin was arrested, the police and the prosecutor believed (correctly) that Martin's power of attorney had ended and (incorrectly) that Martin's father was entitled to stop making the payments. We must look at the facts and circumstances known to the police "at the moment the arrest was made" and at the moment the charges were brought, *Beck*, 379 U.S. at 91, not later, when hindsight adds clarity to the issue.

Everyone now agrees that what Martin eventually did—ask the probate court to order that he be reimbursed from the arrearage judgment and have the checks changed to his name—was the right way to handle this matter from the outset. To Martin's mind, that proves he never should have been arrested because, had he handled the matter the right way from the beginning, nothing would have changed: His father still would have had to make the arrearage payments, and Martin still would have obtained the money. But when the defendants acted, that is not what Martin had done, and that makes all the difference. The police reasonably could believe that the admittedly false endorsement of his mother's checks was a problem by itself, one that could well be wrongful as to Martin's father. That the county court dismissed the charges against Martin only *after* he hired an estate lawyer and only *after* he corrected these mistakes supports the defendants' good faith conduct before and after the charges were brought. Even then, it bears adding, the probate court did not endorse Martin's original conduct by permitting Martin simply to endorse the checks to himself; the court still had to adopt a new procedure for sending the money to him. The key point is that, until the probate lawyer clarified the father's arrearage obligations to the estate, the police were aware of "facts and circumstances . . . sufficient to warrant a prudent man in believing that [Martin] had committed" forgery. *Id*.

Martin argues that Schutzman omitted relevant facts from his report to the prosecutor. But this information matters only if probable cause would have been missing after accounting for these other facts. *See Garner v. Grant*, 328 F. App'x 325, 327 (6th Cir. 2009). Since we have considered all of the facts known to the officers at the time (including those omitted from the report) and found

probable cause as a matter of law, any omissions are necessarily immaterial. Martin adds that the prosecution arose from the bad blood between Schutzman and him. This consideration cuts both ways, as the difficult relationship between the two men could well explain the investigator's report *and* this lawsuit. Either way, the dispositive point remains: Probable cause existed at the time of the arrest, and that reality pierces this argument and each of the others Martin has raised.

III.

For these reasons, we affirm.