70 F.3d 120
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
John KAZA, Plaintiff-Appellant,
v.
Toni ALLEN; Robert Eiriksson; Arthur Danner; Dennis
Smith; Tom Gilbertson; Don Bradley; Richard Kessel,
Robert Tanner; Alfred F. Noren; Bruce Simpson; Bradley
Arbsland; George Foster; and Santa Cruz County,
Defendants-Appellees.
 No. 94-16539.
 United States Court of Appeals, Ninth Circuit.
 Submitted Oct. 24, 1995.*
Decided Nov. 7, 1995.
 
 Before: BEEZER, THOMPSON and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 John Kaza appeals pro se the district court's summary judgment dismissal of his 42 U.S.C. Secs. 1981, 1983 and 1985 actions. He contends that his civil rights were violated when he was arrested without a warrant or probable cause and by various incidents during his 28-day incarceration. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.[1] We affirm in part, and reverse and remand in part.
 
 I. BACKGROUND
 
 3
 In July 1988, Municipal Court Judge Richard Kessell received several threatening handwritten letters signed by the "African International Protectors." One of his close friends received a similar letter. The letters threatened harm to the judge, his family and his friends during their upcoming trip to Africa. On Judge Kessell's recommendation, Bruce Simpson of the sheriff's department began to investigate John Kaza. Detectives Don Bradley and Dennis Smith assisted in the investigation.
 
 
 4
 Kaza had been a frequent litigant in Judge Kessell's courtroom. He had lost a case several months earlier, resulting in his eviction from his rented office space. The sheriff's department obtained samples of Kaza's handwriting from public documents. A forensic document analyst for the Postal Service compared the public documents to the threatening letters. The analyst told Simpson that he was "on the right track with" Kaza, but that the handwriting was disguised and he needed additional writing samples before he could make a more accurate identification. He said that he had a "gut feeling" that Kaza was the letter writer, but that he was "unlikely to ever make a positive I.D." Detective Smith also compared the letters. Although he had no training in handwriting analysis, he thought he could see similarities on five characters.[2]
 
 
 5
 On July 28, 1988, Smith ordered detective Michael Rains to watch the hotel lobby where Kaza lived while Smith prepared arrest and search warrant affidavits. If Kaza appeared in a public place, Rains was to arrest him based on probable cause. When Kaza entered the lobby, Rains arrested him for threatening a public official in violation of California Penal Code Sec. 76. Detectives searched his hotel room and car and seized handwritten documents pursuant to a search warrant.
 
 
 6
 After the arrest, detectives interviewed Kaza and obtained more handwriting exemplars. They also obtained blood and saliva samples. In accordance with a telephone conversation between detective Steve Hartness and Judge Thomas Kelly, bail was set at $500,000. The standard bail for a person charged with threatening a public official is $5,000. As the reason for the increase, Hartness noted that "Judge [Kessell] is scheduled to leave on vacation today." Bail was later reduced to $100,000. Judge Kelly then transferred the case to a visiting judge to ensure impartiality.[3]
 
 
 7
 Kaza was booked at the local county jail. At an intake health screening, he informed the staff that he had non-insulin-dependent diabetes. During his incarceration, he received treatment for kidney stones and medication for high blood pressure.
 
 
 8
 On the day Kaza was to be released, there was an incident involving an overflowing toilet. Jail officials accused Kaza of trying to incite a riot; he insists they were conspiring to keep him in jail. The incident led to Kaza being handcuffed and placed in an observation room for one hour.
 
 
 9
 On August 23, 1988, Kaza was released from custody on his own recognizance. He had been in jail for 28 days. In October 1988, all charges against him were dismissed for insufficient evidence.
 
 
 10
 Kaza sued Santa Cruz County and various county employees. He was pro se for most of the proceedings. After many motions in which multiple defendants were added and dropped from the suit, the district court granted defendants' motion for summary judgment on all issues.
 
 II. ANALYSIS
 
 11
 We review a grant of summary judgment de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 A. Probable Cause
 
 12
 Kaza argues that he was arrested without a warrant and without probable cause. Defendants admit that there was no warrant. In civil cases, whether there was probable cause is a question for the jury. Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir.1994), cert. denied sub nom. Ball v. Gasho, 115 S.Ct. 2582 (1995). If there is no genuine issue of material fact, however, summary judgment is appropriate if "no reasonable jury could find an absence of probable cause under the facts." Id. In making the probable cause determination, we construe the evidence in the light most favorable to Kaza, the non-moving party. Id. "Once a warrantless arrest is established, the burden of going forward with the evidence passes to the defendant[s]." Gilker v. Baker, 576 F.2d 245, 246 (9th Cir.1978).
 
 
 13
 Under California law, an officer may conduct a warrantless arrest in a public place "[w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." Cal.Pen.Code Sec. 836(3). A superior officer who formulates probable cause to arrest may direct a subordinate officer to make the arrest. See Karr v. Tuttle, 774 F.2d 1029, 1031 (10th Cir.1985) (following the "fellow officer" rule). "Probable cause is more than mere suspicion. Probable cause exists when, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability' that a crime was committed.' " Gasho, 39 F.3d 1420, 1428 (quoting United States v. Smith, 790 F.2d 789, 792 (9th Cir.1986)).
 
 
 14
 We look at what Smith knew at the time of the arrest. Beck v. Ohio, 379 U.S. 89, 91 (1964) ("Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it."). He knew that a felony had been committed. He also knew that Kaza had been a frequent litigant in Judge Kessell's courtroom and that he had lost a case several months earlier that caused him to be evicted from his rented office space. A handwriting expert said that the detectives were "on the right track" with Kaza but that he would need more writing samples. The expert also said that he had a "gut feeling" that Kaza was the letter writer, but that he was "unlikely ever to make positive I.D." Based on these facts, Kaza was arrested and jailed for 28 days.
 
 
 15
 These facts, as reflected by the record before us, do not create reasonable cause. Although the known facts may have created a suspicion, they do not constitute enough evidence to cause a " 'man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' " Wartson v. United States, 400 F.2d 25, 27 (1968) (quoting People v. Ingle, 348 P.2d 577, 580 (Cal.1960)). The "gut feeling" of a handwriting expert who admits that he needs more samples provides little justification for a warrantless arrest.
 
 
 16
 "An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest, or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Beck, 379 U.S. at 96. Drawing all reasonable inferences in favor of Kaza, a reasonable jury could find that the police arrested him without probable cause. See Gilker, 576 F.2d at 247. The grant of summary judgment was in error.
 
 B. Excessive Force
 
 17
 Kaza argues that he was subjected to excessive force in violation of his Eighth Amendment rights when he was handcuffed by Robert Eiriksson after an incident at the jail. Although the parties disagree on the reason for handcuffing Kaza, they agree that he was handcuffed and placed in an observation room for approximately one hour. Kaza contends that the handcuffs were unnecessary and were deliberately and maliciously twisted in such a way as to injure his wrist permanently.
 
 
 18
 Kaza's claim that the County "inflict[ed] retribution or revenge against citizens" fails because he offered no evidence to support his claim that there was such a policy or practice. See Monell v. Department of Social Serv., 436 U.S. 658, 690 (1978). Also, none of the named defendants was involved in the alleged incident. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). In his second amended complaint, Kaza failed to name the prison official who handcuffed him. Eiriksson, the prison official who Kaza now accuses on appeal, was dismissed from this case.[4] The district court properly granted summary judgment against Kaza's claim of excessive force.
 
 
 19
 C. Intentional Interference with Judicial Proceeding
 
 
 20
 Kaza alleges that Judge Kessell intentionally interfered with his bail hearings by discussing the case with Judge Kelly. According to Kaza, Judge Kessell telephoned Judge Kelly at home and urged him not to release him from custody.
 
 
 21
 Again, Kaza has failed to present evidence that would allow a reasonable juror to find that Judge Kessell told Judge Kelly not to release him. Drawing all reasonable inferences in favor of Kaza, Judges Kessell and Kelly may have had a conversation during Kaza's incarceration. There is no evidence that during the conversation Judge Kessell asked Judge Kelly not to reduce bail or behaved improperly.
 
 
 22
 Summary judgment was proper on this issue.
 
 
 23
 D. Deliberate Indifference to Kaza's Medical Needs
 
 
 24
 Kaza argues that the county and jail officials were deliberately indifferent to his medical needs in violation of the cruel and unusual punishment clause because they failed to provide him with a special diet for his non-insulin-dependent diabetes during his incarceration.[5]
 
 
 25
 "Jail personnel violate a prisoner's eighth amendment rights if they are deliberately indifferent to the prisoner's serious medical needs. This indifference must be substantial to violate the constitution, and state prison authorities have wide discretion regarding the nature and extent of medical treatment." Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986) (citations omitted).
 
 
 26
 Kaza's claim fails for two reasons. First, his allegations do not rise to the level of deliberate indifference. He does not take any daily medication. His doctor had previously recommended that he be on a 1200 calorie diet and should avoid starches and sugars. He was given an examination upon intake, he was taken to the hospital (where he once refused treatment) and he was monitored by the infirmary. Lack of a specialized diet for a non-insulin-dependent inmate is not "sufficiently serious" to be unconstitutional.[6]
 
 
 27
 Second, Kaza again fails to allege any facts that would demonstrate a pattern or practice of denying medical care that would implicate the county, and no named defendant was responsible for Kaza's medical care.
 
 
 28
 The district court properly granted summary judgment on this issue.
 
 F. Other Claims
 
 29
 Kaza makes various other claims. Summary judgment was properly granted to the defendants on all of them.
 
 
 30
 His complaint alleges violations of 42 U.S.C. Secs. 1981 and 1985. Kaza, who is white, never explains how he was the victim of racial discrimination or of a class-based conspiracy.
 
 
 31
 He argues that he was subject to a state law battery. He has presented no evidence (or argument) that he was ever subjected to unlawful contact by any defendant.
 
 
 32
 He argues that the samples of his blood and saliva were improperly obtained. They were taken in response to a valid search warrant.
 
 
 33
 He argues that his equal protection rights were violated. An equal protection claim requires a showing of dissimilar treatment for people in similar situations. Plyler v. Doe, 457 U.S. 202, 216 (1982). He offers no evidence that he was treated differently from any one else.
 
 
 34
 He argues that he was subjected to excessive bail. Judge Kelly set bail at $500,000 (ten times the statutory amount) based on the recommendation of Detective Hartness. His claim fails because neither Judge Kelly nor Detective Hartness is a defendant.
 
 
 35
 Finally, he contends that he was denied the opportunity to depose several important witnesses. We find that the district court was fair in allowing his discovery requests and extensions of time.
 
 III. CONCLUSION
 
 36
 We reverse and remand the district court's grant of summary judgment on the issue of probable cause. We affirm summary judgment on all other issues.
 
 
 37
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 An earlier appeal was dismissed for lack of jurisdiction because there was a pending motion to alter judgment. Kaza v. County of Santa Cruz, No. 92-16567 (Dec. 20, 1993). That motion has since been denied
 
 
 [2]
 Two other potential letter writers were ruled out based on their handwriting samples. One suspect, David Tolofane, was a black South African who was in the country on a six-month gardening apprenticeship. He had recently been tried for rape in a highly publicized trial. Judge Kessell was not the trial judge, but had remanded Tolofane into custody prior to trial
 
 
 [3]
 There is no evidence in the record before us that Kaza was ever provided a probable cause hearing. If not, then Kaza's first appearance before a judge was on August 1, four days after his warrantless arrest. Kaza did not raise these points in his complaint
 
 
 [4]
 Kaza asks this court to direct the district court to reinstate Eiriksson as a defendant. Eiriksson moved for dismissal because Kaza's second amended complaint failed to allege that he committed any unlawful act. Kaza did not respond to the motion. Instead he filed his third amended complaint in which he named Eiriksson as the "John Doe" who handcuffed him. The district court refused to accept the complaint, which was filed without leave of court. After rejecting the complaint, the court dismissed Eiriksson without prejudice. Kaza never attempted to add him as a defendant at a later time. There is no evidence that Kaza sought leave of court to file another complaint. We find that the court did not abuse its discretion. See Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1991)
 
 
 [5]
 Because Kaza "was a pretrial detainee and not a convicted prisoner at the time of the claimed wrongful conduct, his Sec. 1983 action for inadequate medical treatment arises from the due process clause of the fourteenth amendment and not from the eighth amendment prohibition against cruel and unusual punishment. Although [the] claim arises under the due process clause, the eighth amendment guarantees provide a minimum standard of care for determining [his] rights as a pretrial detainee." Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986) (citations omitted)
 
 
 [6]
 Kaza also argues that having to sleep on the floor (on a mattress) for three nights due to prison overcrowding caused him to develop kidney stones. Kaza did pass a kidney stone during his incarceration. He was hospitalized and received treatment. He presents no evidence that there was any connection between his sleeping arrangements and the kidney stones