NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0806n.06
Filed: November 2, 2006

No. 05-2245

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RONALD JERNIGAN, JR.; TIMOTHY ROBERT SMITH; CHARLES BERNARD PERRYMAN, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| CITY OF ROYAL OAK; ROYAL OAK POLICE DEPARTMENT; J. BALLINGER; R. MILLARD; M. MURRAY; J. STEHLIN; K. SPENCER; S. TEICHOW; R. SPELLMAN, | ) ) ) ) ) ) | |
| Defendants-Appellants, | ) ) | |
| WOODY'S BAR AND GRILL, ET AL., | ) ) | |
| Defendants. | | |

Before: CLAY and SUTTON, Circuit Judges; and SHARP, District Judge.[*]

SUTTON, Circuit Judge. Several material issues of fact preclude us from granting summary judgment on qualified immunity grounds to the government defendants in this case. We affirm.

I.

---

[*]The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

While spending an evening at Woody's Bar and Grill on July 5, 2002, Bobby Joe Phillips realized that he could not find ninety dollars that he had brought with him to the bar. Fearing repercussions from his wife, he entered the first-floor bathroom of the bar, tore his shirt and emerged with the fiction that he had just been robbed. When employees of the bar learned of the alleged robbery, they called 911 and began monitoring three suspects—Ronald Jernigan, Timothy Smith and Charles Perryman. The Royal Oak Police Department (of Royal Oak, Michigan) dispatched several officers to the bar. Upon their arrival, the officers were led to the second-floor bar where Jernigan, Smith and Perryman were located. The officers placed the three men in handcuffs, led them downstairs and outside of the bar, where each man was placed in the backseat of a separate police car. About an hour after detaining the three men, the officers released them.

This broad-brush description of the events of the evening papers over three topics that became central features of the lawsuit that the three detainees eventually filed over their false arrest: (1) Phillips' interaction with the bar's employees before the officers' arrival; (2) the officers' actions before detaining Jernigan, Smith and Perryman and (3) the plaintiffs' detention. Each topic deserves more attention before turning to the issues raised on appeal.

*Phillips' interaction with the bar's employees before the officers' arrival.* In his deposition, Phillips acknowledged that he had consumed five or six "Captain and Cokes" on the night in question (perhaps a partial explanation for the "disappearance" of his money) and that he was drunk when he concocted the robbery story. JA 186–87. After roughing himself up in the first-floor

bathroom at around 12:30 a.m., he approached Joseph Ivy (the manager on duty) and told him, "I was in the bathroom and a gentleman came and hit me from the back and I fell to the ground. I felt him go in my pocket and then [he] exited the rest room." JA 189. Phillips disclaimed ever seeing his assailant's face but described him as having "khaki shorts on, white socks, and . . . tennis shoes" and "darker legs." JA 187. Ivy and Jim Gibbons (a bouncer) led Phillips upstairs to the second-floor bar. Gibbons pointed to the plaintiffs and asked, "[A]re those the gentlemen that did this?" JA 188. Phillips never responded, and the police arrived shortly thereafter. Although Phillips acknowledged later in his deposition that he may have told Ivy that two men, rather than one man, attacked him and that he may have identified the race of his assailant(s) as black, he insists that he never identified the plaintiffs as his attackers and that he did not want the police to be called.

Ivy and Gibbons tell a different story. Ivy claims that he learned of the robbery when Phillips' wife accused him of letting three men attack her husband in the men's restroom. In response, Ivy found Phillips, noticed he had been drinking and asked him what had happened. Phillips said that three men had robbed him in the restroom and that he could identify them by their clothing and footwear. At this point, the stories diverge slightly. Ivy says that he, Gibbons and Phillips looked around the bar for the assailants and that when Phillips saw the plaintiffs, he pointed at them and insisted they had attacked him. Gibbons says that he and Ivy located the plaintiffs based on Phillips' description, then asked Phillips to confirm their identification. It "was definitely them," Phillips insisted, noting that even though he had not seen their faces he could tell it was them based

on what they were wearing. JA 229–30. Ivy or Gibbons then called 911 (neither man can remember who) to report the robbery.

*The officers' actions before detaining Jernigan, Smith and Perryman*. Officer Spellman claims that the officers were dispatched to the bar to investigate a robbery. The dispatcher informed the officers that two black male suspects had been located and remained on the premises. Upon their arrival at about 1:30 a.m., Gibbons met the officers and related to them what had happened (as described by Ivy's and Gibbons' version of events). Gibbons led the officers to the second floor where they met Phillips and several other employees in the stairwell. Officer Spellman observed that Phillips' shirt was ripped and that he was somewhat red in the face. Phillips related what had happened in the bathroom and informed the officers that the bar's security had detained the men who attacked him. Another bouncer, Tito Wallee, led Officers Spellman, Stehlin and Ballinger to the bar and identified Jernigan, Smith and Perryman as the perpetrators.

Ivy and Gibbons again tell a different story. Ivy says that he and Gibbons met the officers, that he explained that "apparently [Phillips] got attacked" and that he told the officers he did not "see why [Phillips] would lie to me about something like this." JA 177. Ivy says that he and Gibbons led the officers upstairs and identified Jernigan, Smith and Perryman. Gibbons says that Phillips identified the suspects.

Phillips, for his part, claims that he did not interact with the police until after they had detained the plaintiffs and that he never identified the plaintiffs to the police as the people who had

attacked him. Further complicating matters, the officers argued to the district court that "they had no opportunity to initially question Mr. Phillips before investigating Plaintiffs" because "they were not given any information as to the identity of the alleged victim . . . upon [their] arrival at the bar." 2d D. Ct. Order at 2.

*The plaintiffs' detention.* Jernigan, Smith and Perryman were sitting at the second-floor bar when the police arrived, blissfully ignorant of everything that had happened so far—under any of the above chronicles of events. Ivy doubted the men had done "anything wrong because they didn't seem nervous or anything." JA 178.

According to Officer Spellman, the officers approached the three men as they were sitting at the bar and asked them to come outside to answer some questions. Before leaving the bar, the officers handcuffed each suspect. Jernigan initially refused to be led outside, and he continued to challenge the officers verbally as they led him and his friends downstairs. Once outside, the officers placed the men in separate police cars; Jernigan again initially refused but again ultimately acquiesced. After placing the men in the police cars, Officers Ballinger and Spencer interviewed Phillips while Officer Stehlin interviewed each plaintiff. After interviewing Phillips and about an hour after arriving at the bar, the officers realized that none of the men matched his description of the assailant(s), and the officers released the men.

Jernigan, Smith and Perryman remember the evening quite differently. They insist that Smith was apprehended first. Smith claims that the police approached him and immediately asked him to

turn around for handcuffing without explanation. He was too shocked to respond and complied with the officers' request. Perryman and Jernigan approached an officer to ask why he had handcuffed Smith. The officer did not answer Perryman when he asked the question; instead he inquired, "You're with him?" and placed him in handcuffs. App'ee Br. App'x § 11 at 8. Jernigan was then handcuffed without any conversation. Smith and Perryman were largely quiet as the police led them downstairs and into the police cars, but Jernigan repeatedly questioned why he was being detained. He only remembers being told that the handcuffing was "for his safety" and to "shut the f*** up." App'ee Br. App'x § 10 at 29, 35. Perryman estimates they were in handcuffs for at least an hour.

On November 19, 2002, Jernigan, Smith and Perryman filed a lawsuit against the City of Royal Oak, the Royal Oak Police Department, several police officers, the bar and several employees of the bar, alleging that their federal constitutional and state-law rights had been violated. The district court dismissed several of the claims and dismissed the complaint against the City of Royal Oak, the Royal Oak Police Department, the bar and the bar's employees in its entirety. The court, however, denied the individual officers' motion for summary judgment with respect to the § 1983 claims premised on the officers' illegal search and seizure and with respect to a state-law false-arrest claim, holding that qualified immunity did not shield the officers from liability.

II.

In reviewing the officers' interlocutory appeal of the district court's qualified-immunity ruling, we consider "whether, on the facts alleged, a constitutional violation could be found."

*Saucier v. Katz*, 533 U.S. 194, 207 (2001). If so, we then ask "whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Id.* at 201. On this record we agree with the district court that the "Plaintiffs have shown sufficient facts to create a genuine issue of material fact as to whether Defendant Officers are entitled to qualified immunity" on the federal search-and-seizure claims and the state-law false-arrest claim. 1st D. Ct. Order at 12. We see no reason to go beyond the thorough opinions of the district court explaining why the officers are not entitled to qualified immunity at this stage in the case, save to emphasize three points.

*First*, giving Jernigan, Smith and Perryman the benefit of the doubt on all inferences from the facts and resolving all disputes of fact in their favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), they have shown that their detention lasted longer than a reasonable investigatory stop and therefore must be supported by probable cause, not reasonable suspicion. An investigatory stop, we have said, must be "reasonably related to the basis for the original intrusion." *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006) (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 20 (1968) (An investigatory stop must be "reasonably related in scope to the circumstances which justified the interference in the first place."). "[T]he length of the detention, the manner in which it is conducted, and the degree of force used" all go into the reasonableness calculation. *Smoak*, 460 F.3d at 781.

The plaintiffs' version of the facts, together with several of Phillips' statements, would permit a reasonable jury to conclude that the stop was unreasonable in all three respects. The

officers purported to detain the plaintiffs to determine whether they had robbed Phillips. Yet it took the officers an hour to determine the startlingly obvious fact that the men had done nothing wrong. Phillips was at the scene, and yet for reasons that remain unclear the officers did not ask Phillips to identify the men *before* seizing them or even immediately *after* seizing them. Instead of taking control of the three men and simply asking Phillips which one of the men (if any of them) robbed him, they handcuffed them and placed them in the police cars. No reasonable explanation is given for the handcuffing, as no one at the bar and none of the officers says that the men appeared in any way to be armed, otherwise threatening or at risk of flight. And no reasonable explanation is given for declining to ask Phillips to identify his attackers at the outset, even though Phillips was there and himself wondered aloud what had prompted the officers to apprehend these three men.

*Second*, a jury not only could conclude that the detention was unreasonable in its length, manner and degree of force, but that probable cause also did not justify a full-blown arrest. Probable cause requires officers to possess "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [plaintiffs] had committed or [were] committing an offense," *Beck v. Ohio*, 379 U.S. 89, 91 (1964), a requirement that we review under the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

As the officers see things, they not only had reasonable suspicion to stop the plaintiffs but also had probable cause to arrest them. When they arrived at the bar that evening, they spoke to Gibbons or Ivy (they do not know whom). One of these two employees said that they had spoken

to the victim, and he had identified the plaintiffs as his assailants. On that basis alone, the officers arrested the three men.

There are two problems with this theory of probable cause. For one, there is good reason to doubt whether these conversations took place. Phillips testified that he *never* identified the plaintiffs as his assailants—whether to Gibbons, to Ivy, to the officers or to anyone else. Phillips testified that he always told Gibbons, Ivy and others that there were only one or two assailants, not three. And according to the plaintiffs' version of the arrest, the officers did not approach all three of them and arrest them, which is presumably what the officers would have done if they had been told that the victim said all three of the men had robbed him. Instead, the officers approached Smith and handcuffed him, then arrested Perryman and Jernigan only after they asked the officers why they had arrested their friend. Rather than answer this straightforward question, one of the officers said to Perryman, "You're with him?" and placed him in handcuffs, and soon after that did the same to Jernigan. Plaintiffs are entitled to ask a jury to resolve these inconsistencies, to determine who is telling the truth.

For another, even if Gibbons or Ivy did tell the officers that the victim had identified the plaintiffs as his attackers, the officers offer no reasonable explanation for stopping there. They did not ask the employee to recount his conversation with the victim. They did not ask the employee who the victim was or how the victim knew these were the robbers: Did he see them face to face? Did he see all three of them or just one or two of them? Nor of course did the officers—any of

them—speak to the victim before handcuffing the three men. And most conspicuously, the officers fail to explain why they did not simply detain the three suspects through a *Terry* stop, then ask the victim to determine whether these three men had robbed him. All of this occurred to three men whose behavior that evening, several employees commented, offered no indication that they had done anything wrong.

Police officers, no doubt, have a difficult job to do. And for that reason, we do well to give them the benefit of the doubt in qualified-immunity cases and to appreciate that the probable cause necessary to arrest a suspect does not require beyond-a-reasonable-doubt guilt, just "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [plaintiffs] had committed or [were] committing an offense." *Beck*, 379 U.S. at 91. But whether it is a difficult job or not, it remains a job, which consists at least of doing more than merely arriving at a bar and arresting whomever an employee fingers as the villains, without inquiring into why and what that person claims to know about the crime. A jury, in short, could reasonably conclude that while the officers may have had reasonable suspicion to stop the plaintiffs, the stop exceeded the bounds of a reasonable *Terry* stop and the officers did not have probable cause to arrest them.

*Third*, because it is clearly established that officers need probable cause before arresting an individual and searching him, we cannot grant qualified immunity based on the second *Saucier* inquiry. *See St. John v. Hickey*, 411 F.3d 762, 770 (6th Cir. 2005) (holding that disputed issue of

material fact regarding probable cause precluded the court from granting the officers qualified immunity).

III.

For these reasons, we affirm.