JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Tiesha Cole, appeals her conviction for resisting arrest and obstructing official business, misdemeanors of the second degree. Finding no merit to the appeal, we affirm.
 {¶ 2} In April 2006, Cole was indicted on three counts: count one, assault (on a peace officer), in violation of R.C. 2903.13(A); count two, resisting arrest, in violation of R.C. 2921.33; and count three, obstructing official business, in violation of R.C. 2921.31, with a furthermore clause that she created a risk of physical harm to a person. She pled not guilty and the case proceeded to a jury trial. The state presented the following evidence to the jury.
 {¶ 3} Officer Joe Szelenyi of the Newburgh Heights Police Department testified that on March 6, 2007, around 7:00 p.m., he was on routine patrol in the area of East 44th Street in Newburgh Heights. He observed a Ford minivan in front of a house at 4052 East 44th Street. The van was running and its parking lights were on. There was no driver in the driver's seat and it "looked like [there was] horseplay going on" inside the van.
 {¶ 4} Officer Szelenyi "ran a registration check on the vehicle." The dispatcher informed him that "the plate came back to a Richard Driver" and that "[h]e was wanted out of Cleveland on a domestic violence warrant." The warrant had a red flag on it, "approach with caution" because Driver had a "prior concealed carry." At that point, Officer Szelenyi radioed Officer John Manson, *Page 4 
who was in the area, for assistance. Both officers "sat stationary" in their zone cars and waited to see if a man came out of the house where the van was parked and still running.
 {¶ 5} Officer Szelenyi said that when he saw a man (who was later identified to be Driver) come out of the house, Officer Manson activated his overhead lights and pulled up to the van. Officer Szelenyi then did the same. Both officers put "spotlights" on Driver. Officer Szelenyi said that Driver did not respond to the spotlights nor did he respond to his request telling him to stop and "stay right there." Instead of listening to the officers, Driver reached inside his jacket pocket. The officers then pulled their service weapons on Driver and he took his hand out of his pocket. Driver put both hands on the van "at first," but then he reached for the door handle of the van. Officer Szelenyi thought Driver was "going to flee." Officer Szelenyi approached Driver, put his hands on Driver's shoulders, and told him to "relax." Instead, Driver "threw his right elbow up" and struck Officer Szelenyi in his right jaw. Driver began running across the street and Officer Manson grabbed Driver's right arm. Officer Szelenyi tried to grab Driver's left arm, but missed. Driver tried to punch Officer Szelenyi in the head "but he just grazed the top of [his] head." Both officers and Driver "fell onto the treelawn right across the street."
 {¶ 6} As they were still trying to secure Driver to arrest him, Officer Szelenyi said that he heard a woman (who was later identified to be Cole) *Page 5 
"screaming, let him go, let him go, let him go." Before Officer Szelenyi could even see where the woman was yelling from, she jumped on his back, began "punching [him] in the back of the head," and pulling on his jacket. Officer Szelenyi explained that he was "getting ready to kick backwards" at Cole, who was still on top of him, when he heard Officer John Lally at the scene.
 {¶ 7} Officer Lally said that he and his partner were on routine patrol when they saw "a melee, fighting going on in the middle of the street." He saw Cole "striking" Officer Szelenyi in the head. Cole "had a baby on her hip" and was "holding it" while she was striking Officer Szelenyi in the head. Officer Lally asked Cole to give him the baby several times. She refused to give the baby to him, but he said that she did eventually give it to a young female who removed the baby from the scene. Officer Lally then "took [Cole] to the ground with an arm bar" and she was handcuffed.
 {¶ 8} Officer Szelenyi further explained that when he rolled away from Cole, he saw that "she had one hand on [his] jacket, and the other, she had a baby, or *** toddler, in a onesy and [in] like a chokehold in her arm." Officer Szelenyi stated that after Officer Lally secured Cole, the officers were also able to secure Driver.
 {¶ 9} Officer Manson also testified and verified the testimony of the other two officers. *Page 6 
 {¶ 10} Cheryl Moran was the last to testify for the state. She explained that on the day in question, she lived at 4066 East 44th Street, three houses down from where the van was parked. She heard a baby screaming and went outside. She saw Cole "on her front porch" with the baby on her hip. She then witnessed Cole leave her front porch with the baby. She saw an officer tell Cole to "go back into the house with the baby three times" or she would be arrested. She then observed Cole take the baby back to the house and return to the officers.
 {¶ 11} At the close of the state's case, Cole moved for a Crim. R. 29 acquittal, which was denied by the trial court.
 {¶ 12} The jury returned a guilty verdict on count two, resisting arrest, and count three, obstructing official business, but did not find Cole guilty of the furthermore clause (that she caused a risk of physical harm to a person). As for the assault charge (count one of the indictment), the jury could not reach a unanimous vote and therefore a mistrial was declared on this count. After the state indicated that it would not retry Cole on the assault charge, the court dismissed it with prejudice.
 {¶ 13} The trial court sentenced Cole to 90 days in the county jail on counts two and three, to be served concurrently, and then suspended the 90 days. The court then sentenced Cole to 180 days probation and ordered that she perform 50 *Page 7 
hours of Court Community Work Service ("CCWS"). Finally, the court ordered that it would waive court costs if she completed CCWS.
 {¶ 14} It is from this judgment that Cole appeals, raising three assignments of error for review:
 {¶ 15} "[1.] The alleged arrest was not lawful, and therefore any action on the part of Tiesha Cole did not constitute resisting arrest.
 {¶ 16} "[2.] The performance by the within police was not an authorized act, it was not lawful, and therefore any action on the part of Tiesha Cole did not constitute obstructing official business.
 {¶ 17} "[3.] The evidence was against the manifest weight of the evidence."
 {¶ 18} In her first assignment of error, Cole maintains that herFourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because she could not have been convicted of resisting arrest when the arrest was unlawful. In its closing arguments, the state argued that Cole was not arrested for "resisting her own arrest," but because she "interfered in the lawful arrest of Richard Driver."[1]
 {¶ 19} R.C. 2921.33(A) provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Thus, a *Page 8 
lawful arrest is an essential element of resisting arrest. See R.C. 2921.33(A); State v. Karle (2001), 144 Ohio App.3d 125, 133.
 {¶ 20} Cole admits that the officers who arrested Driver knew that Driver had an active warrant out for his arrest. But she contends that the police officers' initial "stop" of Driver, when Driver approached the van, was a Fourth Amendment violation because it was possible that he may not have been the "owner of the van" or that the owner of the van could have loaned it to someone. She contends that the officers should have asked him for his driver's license or other identification to ascertain whether he was the person with the active warrant.
 {¶ 21} "The Fourth Amendment of the United States Constitution, as well as Article One, Section Fourteen, of the Ohio Constitution, guarantee `the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' When a police officer stops a person and detains him or her, a `seizure' is committed within the meaning of the Fourth and Fourteenth Amendments of the United States Constitution." State v. Wojtaszek, 11th Dist. No. 2002-L-016, 2003-Ohio-2105, at _15, citing Delaware v. Prouse (1979),440 U.S. 648, paragraph two of the syllabus. *Page 9 
 {¶ 22} "A stop is constitutional if it is supported by either a reasonable suspicion or probable cause." State v. Molek, 11th Dist. No. 2001-P-0147, 2002-Ohio-7159, at _25. In order to make an investigative stop within constitutional parameters, a police officer must be able to cite articulable facts that give rise to reasonable suspicion of criminal behavior. Terry v. Ohio (1968), 392 U.S. 1, 21. "The test for probable cause is: `whether at the moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.[']"Molek, supra, at _25, citing Beck v. Ohio (1964), 379 U.S. 89, 91.
 {¶ 23} In the instant case, Officer Szelenyi ran the license plate of the van that was parked and running. It is well established that a police officer does not need to possess specific facts warranting suspicion of criminal behavior to run a license plate check on a vehicle traveling the public roadway. State v. Owens (1991),75 Ohio App. 3d 523, 525; see, also, State v. Kent (June 18, 1998), 8th Dist. No. 72435;State v. Moss (Feb. 16, 2000), 9th Dist. No. 19698; State v.Pennington (July 17, 1998), 6th Dist. No. WD-97-122.
 {¶ 24} "`While random stops of vehicles without any reasonable suspicion of criminal activity may be constitutionally invalid, random computer checks of vehicle license plates are not. One does not have any expectation of privacy in a license plate number which is required to be openly displayed on his vehicle. *Page 10 
R.C. 4503.21. Moreover, a scan of a computer data bank, in order to obtain information relevant to the license number, involves no intrusion. Such a `search' does not interrupt a driver in his travel, nor restrain his person or detain him. In sum, it does not even constitute a `stop[.]' ***" Rocky River v. Saleh (2000),139 Ohio App.3d 313, 327, quoting Moss, supra.
 {¶ 25} Thus, Officer Szelenyi did not violate Driver'sFourth Amendment rights by running the license plate of the van. And when he did, he discovered that not only did Driver have an active warrant out for his arrest, he was cautioned that Driver may be dangerous.
 {¶ 26} An arrest warrant charges law enforcement officers to arrest the person for whom the warrant was issued. R.C. 2935.02; Crim. R. 4(D). In performing their duty, officers may not engage in "conduct which is overbearing or harassing, or which trenches on personal security without the objective evidentiary justification which the Constitution requires." Terry, supra, at 15. When determining whether a search and seizure was reasonable, the dual inquiry is "whether it was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20.
 {¶ 27} Although Driver was not actually driving the van when Officer Szelenyi ran the license plate, the van was running. When Driver came out of the house and walked up to the driver's side door of the running van, with his *Page 11 
keys in his hand, it was reasonable for the officers to infer that he was the owner of the van. Both officers testified that Driver ignored their spotlights, as well as their requests to stop and stay where he was. When they approached him, he put his hand in his pocket and that is when they pulled their service weapons on him. Knowing that Driver had a prior carrying a concealed weapons charge, it was not only reasonable for the officers to do so, it was necessary for their safety. After ignoring the officers' request to keep his hands on the van, Driver then elbowed Officer Szelenyi in the jaw and took off running.
 {¶ 28} Cole argues that before they arrested Driver, they were obligated to request his identification before they "tried to seize" him. Cole's arguments, however, belie what the evidence revealed at trial. The officers never had an opportunity to request Driver's identification before he blatantly refused every order they gave him, assaulted Officer Szelenyi, and then ran from the officers. Driver's arrest was clearly lawful.
 {¶ 29} Accordingly, Cole's first assignment of error is without merit.
 {¶ 30} In her second assignment of error, Cole essentially makes the same arguments that she makes in her first assignment of error, except with respect to her conviction for obstructing official business.
 {¶ 31} R.C. 2921.31(A) provides that "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do *Page 12 
any act that hampers or impedes a public official in the performance of the public official's lawful duties."
 {¶ 32} Cole claims that the officers were not operating "within their lawful duties." As we already determined in the preceding section, however, the officers' actions were lawful. Accordingly, Cole's second assignment of error is without merit.
 {¶ 33} In her final assignment of error, Cole maintains that her convictions were against the manifest weight of the evidence.
 {¶ 34} In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court explained:
 {¶ 35} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *** Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *** Weight is not a question of mathematics, but depends on its effect in inducing belief' (Emphasis added.) ***
 {¶ 36} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. *** `The court, reviewing the entire record, weighs the *Page 13 
evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" (Internal citations omitted.)
 {¶ 37} The evidence presented reveals that when the officers were trying to secure Driver to arrest him, Cole came running out of the house, screaming at them to let him go. She then jumped on Officer Szelenyi's back and began hitting him in the head. Cole does not contest this evidence. But Cole argues that the officers' testimony that she was carrying a baby was a lie. She asks, "[h]ow on earth can Ms. Cole commit these acts with a baby in her hands?"
 {¶ 38} Although Cole's argument is irrelevant to the crimes that she was convicted of, the record nonetheless negates her claim. Three officers testified that Cole was carrying a baby or toddler. Officer Lally stated that Cole had the baby in a "chokehold" while she was hitting Officer Szelenyi in the head. Officer Szelenyi also testified that when he was able to turn around and see who was on his back, he saw Cole with the baby in her arms. And Officer Manson also saw Cole with the baby in her arms when she was attacking Officer Szelenyi. Although Moran (the neighbor) did not state that she actually saw Cole hitting *Page 14 
the officer with the baby in her arms, she did see Cole leave her porch with the baby and approach the officers.
 {¶ 39} After reviewing the evidence presented at trial, we do not find that the jury clearly lost its way. In fact, the jury found her not guilty of the furthermore clause that she created a substantial risk of harm to Officer Szelenyi. Thus, we find that Cole's convictions were not against the manifest weight of the evidence.
 {¶ 40} Accordingly, Cole's third assignment of error is overruled.
 {¶ 41} The judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 15 
CHRISTINE T. MCMONAGLE, P.J., and FRANK D. CELEBREZZE, JR., J., CONCUR.
[1] The state filed the wrong brief to this court. Although it had the correct statement of the case and facts, its entire argument did not address the issues in this case. In fact, it appeared that the state simply cut and pasted from a previous appellate brief (where another appellant had challenged his convictions for kidnapping, intimidation, retaliation, and assault). *Page 1