[Cite as *State v. Hobson*, 2025-Ohio-4901.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

AMY G. HOBSON,

    DEFENDANT-APPELLANT.

CASE NO. 1-24-58

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2023 0259

Judgment Affirmed

Date of Decision: October 27, 2025

APPEARANCES:

    *William T. Cramer* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**WALDICK, P.J.**

{¶1} Defendant-appellant, Amy Hobson ("Hobson"), appeals the judgment of conviction and sentence entered against her in the Allen County Court of Common Pleas, following a jury trial in which Hobson was found guilty of two felony-level charges of Operating a Vehicle Under the Influence of Alcohol ("OVI"), Harassment with a Bodily Substance, and Failure to Stop After an Accident. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on October 12, 2023, when an Allen County grand jury returned a 4-count indictment against Hobson, charging her as follows: Count 1 – OVI, a third-degree felony in violation of R.C. 4511.19(A)(1)(a) and (G)(1)(e); Count 2 – OVI, a third-degree felony in violation of R.C. 4511.19(A)(2)(a) and (G)(1)(e); Count 3 – Harassment with a Bodily Substance, a fifth-degree felony in violation of R.C. 2921.38(B); and Count 4 – Failure to Stop After an Accident, a first-degree misdemeanor in violation of R.C. 4549.02(A)(1)(b).

{¶3} On October 20, 2023, Hobson filed a written plea of not guilty to all counts of the indictment.

{¶4} On December 8, 2023, Hobson filed a motion to suppress evidence. On December 15, 2023, the State of Ohio filed a response in opposition to the motion to suppress. On January 4, 2024, a suppression hearing was held. On February 12,

2024, the trial court filed a judgment entry overruling the motion to suppress in its entirety.

{¶5} On September 3, 2024, a jury trial commenced in the case. During the course of the two-day trial, the prosecution presented the testimony of nine witnesses and a number of evidentiary exhibits. At the close of the state's case, Hobson made a motion for acquittal pursuant to Crim.R. 29, which was overruled by the trial court. Hobson then opted to present no evidence. The Crim.R. 29 motion was renewed by Hobson and again overruled. Following closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation on September 4, 2024 at 4:29 p.m. On that same date, at 8:00 p.m., the jury returned verdicts finding Hobson guilty on all four counts in the indictment.

{¶6} On September 18, 2024, a sentencing hearing was held. At the start of that hearing, the trial court found that Counts 1 and 2 of the indictment would merge for sentencing purposes, and the State of Ohio elected to proceed to sentencing on Count 2. The trial court then sentenced Hobson as follows: Count 2 – 30 months in prison; Count 3 – 9 months in prison; and Count 4 – 60 days in jail, with all sentences to be served concurrently. The trial court journalized its sentencing orders by judgment entry filed that same date.[1]

---

[1] A *nunc pro tunc* entry was subsequently filed on September 19, 2025, correcting an error in the original sentencing entry as to the sentence on Count 4.

{¶7} On September 25, 2024, Hobson filed the instant appeal.

*Summary of Evidence Presented at Trial*

{¶8} On August 14, 2023, shortly before 11:30 p.m., William M. ("William") was driving his 2005 Toyota RAV4 near downtown Lima, after having picked up his step-daughter, Bionca S. ("Bionca"), at work. In the vehicle along with William and Bionca were William's wife, Bionca's husband, and William's three-year-old granddaughter. While enroute home with the family after picking up Bionca, William stopped at a red light on Charles Street, at the intersection of Charles Street and North Street. After the light turned green, William began to turn left, or west, onto North Street when a vehicle driving eastbound on North Street ran the red light and crashed into William's RAV4. William's vehicle was totaled by the force of the collision.

{¶9} At trial, William testified that, just prior to being struck by the other vehicle, he heard two pops that sounded like gunfire. After his vehicle was hit, one of his passengers called 911. While waiting on the police and rescue squad to arrive, William was assisted out of the vehicle by his step-son-in-law, and William then sat down on the front steps of a bar across the street. The driver of the other vehicle, whom William did not see, drove away from the area before first responders arrived at the accident scene. William was taken to a nearby hospital, where he was admitted.

{¶10} Bionca testified at trial that, just before the collision, as William was easing into the intersection to turn left, she heard loud popping noises. Bionca thought the noises were the sounds of another car hitting what Bionca described as cones in the middle of the road. Bionca then saw the headlights of a car running the red light at the intersection where they were located but, before Bionca could react, the car hit them. Bionca got out of the RAV4, and the driver of the other car, a female, came running toward Bionca. The female began screaming that William's vehicle had run the red light, an assertion which Bionca testified was completely false. After the female driver of the other car approached Bionca, screaming, Bionca then began calling for her husband, Joseph, by name. As a result, the female driver of the other car also nonsensically began screaming "Joseph". The female driver of the other car then got back into her car and drove away. At that time, no police or fire personnel had yet arrived at the scene, and the female driver of the other car had not provided her name, address, or insurance information. At trial, Bionca identified Hobson as being the female who had been driving the other car.

{¶11} Lakendra Blackman testified that, on August 14, 2023, around 11:20 p.m., she was working on renovating an office space in a building located near the scene of the accident. Just prior to the accident, Lakendra heard a vehicle flying past the building she was in. The vehicle was driving so quickly that Lakendra thought it was the police on a pursuit, chasing someone. Just after that, Lakendra

heard a big boom that sounded like a crash. Lakendra, and an acquaintance who was with her, assumed the noise was a vehicle striking something, and so they went down the street to see if assistance was needed. Once at the scene of the crash, Lakendra observed a damaged gray vehicle and a damaged blue vehicle, and one of the vehicles was smoking. There were people trying to get out of one of the vehicles and, when Lakendra asked if everyone was all right, the occupants of that vehicle said no, they had been hit. Lakendra then noticed a woman standing there, and the woman was saying, "You M-f'ers hit me!", and continued to curse at the people still in the vehicle. Lakendra and others who had stopped at the scene began trying to help the occupants of the one vehicle, as one of them was bleeding, and that gentleman then sat down in front of the bar. Lakendra testified that while that was happening, the woman from the other vehicle approached again, slurring her words and swearing at people. Lakendra testified that she thought the woman was under the influence. At trial, Lakendra identified Hobson as the woman who had been slurring her words and swearing at the accident scene, and Lakendra testified that Hobson drove away from the scene before the police arrived.

{¶12} After receiving multiple 911 calls about the collision, the Lima Police Department dispatched several officers to the crash scene at North and Charles Streets. Patrolman Jalen Bagley testified that he was one of the first officers to arrive at that location, where he and the first officer on scene, Patrolman Rayoum,

located only one damaged vehicle, a Toyota. At that time, all occupants of the Toyota had been able to get out of the car, which had sustained front end damage. Patrolman Bagley also testified that, just down the street, there were several plastic traffic cones in the street, three or four of which had been hit. Bagley also observed vehicular debris in the road at the accident scene, and at trial he identified several photographs of the scene as he and Patrolman Rayoum found it upon their arrival.

{¶13} Patrolman Amy Glanemann, a 20-year veteran of the Lima Police Department, was also dispatched to the accident scene that night. Glanemann testified that over the course of her twenty years with the police department, she had encountered countless intoxicated individuals, particularly while working third shift. On August 14, 2023, Glanemann arrived at the corner of North and Charles Streets at approximately 11:35 p.m. Glanemann testified that she observed the grill of a vehicle, along with other debris, in the intersection, as well as a sign that had been hit. Only one of the vehicles involved in the collision was at the scene at that time, but officers then received a communication from dispatch that the driver of the other vehicle had called in and said she was at 820 West Elm Street.

{¶14} As a result of receiving that information, Glanemann drove to 820 West Elm Street. Glanemann testified that, as she was pulling up to that address, she noticed a silver SUV parked directly in front of 820 West Elm Street, and the vehicle's hazard lights were flashing. As Glanemann approached that vehicle, she

noticed that the airbags had been deployed and, after walking around the front of the vehicle, Glanemann observed that the grill was damaged, as was the side of the vehicle. Glanemann noted that there was a can of beer inside the vehicle. As Glanemann began walking up to the house, another officer, Patrolman Martinez, arrived.

{¶15} As Patrolman Glanemann walked up the steps to the front of the house, Hobson exited the home, eating a chalupa. Glanemann asked Hobson if she was involved in an accident, and Hobson said she had been, along with another vehicle. Glanemann then asked Hobson what had happened, and Hobson replied that Glanemann had everything she needed to know, and to just look at her vehicle. When asked why she left the scene of the accident, Hobson stated that the police were taking too long to get there. Hobson then added that she felt threatened by a female at the scene. Glanemann testified that, at that point, she could smell a strong odor of alcohol on Hobson's breath, that Hobson was slurring her words, that her speech was slow and drawn out, and that her eyes were bloodshot and glassy. Patrolman Glanemann asked Hobson if she had been drinking that night, and Hobson said she had been earlier. Glanemann asked how much earlier, and Hobson pointed down at the ground and made a side-to-side motion and asked if Glanemann wanted her to take a breathalyzer test. Glanemann testified that Hobson's boyfriend or fiancé then walked out of the house and began yelling at Hobson not to take a

test. At that time, Glanemann diverted her attention from Hobson to the boyfriend, while Patrolman Martinez began interacting with Hobson.

{¶16} Patrolman Glanemann testified that, as she was asking the boyfriend to step back and not interfere in the investigation, Patrolman Martinez was speaking to Hobson about taking sobriety tests. Hobson indicated that she was refusing to take a breath test, and so Martinez instructed her to stand up and put her hands behind her back. At or near that time, Patrolman Justin Wireman also arrived at Hobson's home. The officers then attempted to handcuff Hobson, who initially resisted those efforts. Hobson was told to quit resisting, and she then complied. Hobson was placed in handcuffs and the officers began walking her down to Patrolman Glanemann's cruiser. When they got to the cruiser, Glanemann tried to pat down Hobson's waist area, but Hobson bent over to prevent Glanemann from doing so. The officers had to stand Hobson up, and they placed her against the cruiser. At that point, Glanemann was on Hobson's left side, still trying to pat her down, and Hobson then spit on Glanemann's face. Glanemann testified that Hobson was also extremely angry and hostile during that part of the encounter, cussing at Glanemann and ultimately yelling so loudly that it created a disturbance in the neighborhood.

{¶17} The officers were finally able to get Hobson into the cruiser, and she was then transported to the Lima Police Department. The vehicle that Hobson had

been driving that night, a Ford Edge that was determined to be owned by her, was impounded and towed by the police department. At trial, Patrolman Glanemann identified State's Exhibit 8 as being the audio-video footage from her body camera during the encounter with Hobson on August, 14, 2023, and that exhibit was then played for the jury.

{¶18} On cross-examination, Glanemann acknowledged that Hobson's vehicle had been parked legally on the street in front of her residence. Glanemann further acknowledged that Hobson was able to open the front door, walk down the porch steps, and sit down in a chair outside without apparent difficulty, although Glanemann noted that Hobson swayed slightly while standing and stumbled a bit when getting up from the chair. Glanemann also agreed, when asked, that Hobson had been eating her chalupa without fumbling it, dropping it, or missing her mouth. Glanemann acknowledged that Hobson's speech had been intelligible, but Glanemann also noted that Hobson's speech was a little slow and drawn out. Glanemann testified that, to her knowledge, Hobson had not soiled herself or vomited. Patrolman Glanemann also acknowledged that symptoms of head injuries can mimic signs of impairment and confirmed that Hobson had not been evaluated for any injuries following the accident.

{¶19} On redirect-examination, Glanemann testified that, based on her observations that night, her training, and her twenty years of law enforcement experience, it was her belief that Hobson was impaired at the time.

{¶20} Patrolman Justin Wireman and Patrolman Michael Martinez also testified at trial about their interactions with Hobson on August 14, 2023, and footage from their body cameras was introduced in evidence and played for the jury.

{¶21} Patrolman Wireman testified that, after Hobson had been taken into custody and transported to the police department, he checked Hobson's car at 820 West Elm Street and took photographs documenting its condition prior to it being towed. Inside the car, Wireman noted there was an unopened beer can on the passenger floor board that still felt cold to the touch. Wireman testified that he observed several signs of intoxication when interacting with Hobson that night, including her making irrational statements, her indecisive answers when asked questions by the officers, an overwhelming odor of alcohol on her breath, and eyes that were slightly bloodshot but very glossy.

{¶22} Patrolman Martinez testified that, in speaking with Hobson on the night in question, he observed that she was both agitated and standoffish. He further noted the odor of alcohol on her breath, that her eyes were bloodshot and glossy, and that her speech was not smooth. Martinez confirmed that, after Hobson was transported to the police department, she was read a form advising her of the legal

consequences of refusing a breathalyzer test, and that Hobson then formally refused to take the test. Martinez also testified that, when going over the form with Hobson, she asked that he put her glasses on for her, which he did even though the glasses had no lenses in them. Hobson then seemed content to wear the eye glass frames as she reviewed the form and she said nothing about the fact that they lacked lenses. After Hobson refused the breath test, Martinez transported her to the Allen County Jail. During that five-minute drive, Hobson continually referenced Patrolman Glanemann, repeatedly calling the female officer a "bitch".

{¶23} The last witness for the prosecution at trial was Detective Brian Snyder of the Lima Police Department. Snyder testified that on August 15, 2023, the day following Hobson's arrest, he was assigned to do follow-up investigation on the case. On that date, he conducted an interview with Hobson, and an audio-video recording of that interview was introduced in evidence at trial and played for the jury. During the interview, Hobson stated that she called 911 twice the night before; however, Snyder testified that the police department records all 911 calls and their system had no record of a second call from Hobson. Hobson also stated that an officer at the accident scene told her she could leave, although Snyder testified that, upon his checking, there was no record of any officer from any local law enforcement agency having arrived at the scene prior to Hobson leaving the area. During the interview, Hobson told Snyder that she had consumed a 24-ounce can of

Four Loko prior to the accident. Snyder testified that Four Loko is an alcoholic beverage with an extremely high content of alcohol in it, around fourteen percent, compared to a standard beer that has between four and five percent alcohol in it. Snyder testified that, based on his experience investigating OVI cases, it is also extremely common for OVI suspects to minimize their alcohol consumption.

{¶24} Finally, the parties stipulated at trial that Hobson had a prior felony OVI conviction, and that she had previously been convicted of OVI within the twenty years prior to the date of the OVI offenses at issue in the instant case.

*Assignments of Error Raised on Appeal*

### First Assignment of Error

**Appellant's rights under the federal and state constitutions to be free of unreasonable search and seizures were violated by an arrest for OVI that was not supported by probable cause to believe appellant was impaired.**

### Second Assignment of Error

**Appellant's due process rights were violated by the convictions for operating a vehicle while under the influence because there was insufficient evidence that appellant's ability to drive was noticeably impaired by alcohol.**

### Third Assignment of Error

**The weight of the evidence did not support appellant's convictions for operating a vehicle while under the influence because there was insufficient evidence that appellant's ability to drive was noticeably impaired by alcohol.**

*Analysis of Assignments of Error*

*First Assignment of Error*

**{¶25}** In the first assignment of error, Hobson asserts that the trial court erred in overruling the motion to suppress filed by Hobson with regard to whether her warrantless arrest for OVI was supported by probable cause.

**{¶26}** As to this issue, the record reflects that Hobson filed a motion to suppress on December 8, 2023, in which she sought, among other things, the exclusion of evidence stemming from her arrest on the basis that the arresting officers lacked probable cause to believe Hobson was impaired, and therefore lacked probable cause to arrest her for OVI.

**{¶27}** A suppression hearing was held on January 4, 2024. At the hearing, the parties stipulated to the admission of State's Exhibit 1, an audio-video recording from the body camera worn by Lima Police Department Patrolman Amy Glanemann on August 14, 2023, and further stipulated to Defendant's Exhibit A, a portion of the audio-video recording from the body camera worn by Lima Police Department Patrolman Michael Martinez on that same date. The prosecution also presented the testimony of Patrolman Glanemann at the suppression hearing.

**{¶28}** On February 12, 2024, the trial court filed a judgment entry overruling the motion to suppress.

{¶29} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson,* 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts,* 2006-Ohio-3665, 850 ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside*, at ¶ 8.

{¶30} In the instant case, the trial court reviewed the evidence presented at the suppression hearing and made the following findings of fact in its judgment entry overruling the motion to suppress:

> The evidence reveals that officers were dispatched to the scene of an accident at the intersection of North and Charles Streets in Lima, Ohio, at approximately 11:30 p.m. on August 14, 2023. When Ptl. Glanemann arrived, Ptl. Rayoum was already on scene. Ptl. Rayoum informed Ptl. Glanemann that a gray or silver SUV was also involved in the accident and had left the scene, leaving behind its bumper and grill at the scene. Meanwhile, the defendant had contacted the police and told them that she was involved in the accident, left, and was now at 820 W. Elm St.
>
> Ptl. Glanemann proceeded to the Elm St. address. Once there, she saw a silver Ford Edge located on the street in front of the home. The vehicle's hazard lights were on, and the vehicle had sustained serious damage. The bumper and grill were missing, the passenger side had heavy damage, and both side and front air bags in the vehicle had been deployed. Ptl. Glanemann walked to the front porch of the house, and

-15-

the defendant exited the home carrying what appeared to be a chalupa from Taco Bell. Ptl. Glanemann asked the defendant what had happened, and the defendant acted very dismissive of Ptl. Glanemann. The defendant walked past the officer, provided fairly short responses, and sat down and proceeded to eat her food. According to Ptl. Glanemann, she could smell the odor of alcoholic beverage coming from the defendant. Although Ptl. Glanemann attempted to ask the defendant for information related to the accident, at one point, the defendant waived [*sic*] her off and told her that she had everything she needed to find out what happened. The defendant later admitted she was driving during the accident but stated that the other driver caused the accident. She also stated that she left because the police were taking too long. She later revised this statement and said that she felt threatened by the other people who were present at the accident scene and that was why she left.

When asked by Ptl. Glanemann whether she had been drinking, the defendant acknowledged that she had but stated that she had done so "way earlier." Ptl. Glanemann then asked her how much she had drank, and the defendant asked Ptl. Glanemann if she wanted her to take a breath test. By this time, Ptl. Martinez and Ptl. Wireman had arrived and approached the porch. Ptl. Glanemann instructed the defendant that she could go with Ptl. Martinez to perform sobriety tests. The defendant's significant other had also exited the home and began questioning what was happening with the defendant. Things became fairly intense and the defendant repeatedly asserted that she was going inside her home. The officers told her that she was not, and Ptl. Wireman reached for the defendant's chalupa. When he did this, the defendant quickly shifted her arm away from Ptl. Wireman and told him not to touch her food, eventually telling the officers that they had not washed their hands. Throughout this time, Ptl. Glanemann noticed that the defendant had bloodshot, glassy eyes and was talking slowly.

The defendant spoke with Ptl. Martinez but refused any testing. Ptl. Martinez started to arrest the defendant, and Ptl. Glanemann went to assist. The defendant resisted but was able to be handcuffed. As the officers attempted to place the defendant in the cruiser, she spat on Ptl. Glanemann. Throughout this portion of the encounter, the defendant repeatedly used profanity and was uncooperative. The

defendant was transported to the police department but refused to submit to any testing after being read BMV Form 2255. * * *

(Judgment Entry on Motion to Suppress, Docket No. 32, pp. 2-3).

{¶31} In its decision, the trial court further found that, while Hobson's eyes did not appear red in the body camera footage admitted into evidence at the suppression hearing, Glanemann was clear in her testimony that she noticed Hobson's eyes were bloodshot through her in-person observations on the night in question. Based upon the limitations of body cameras compared to a person's actual view, as well as Glanemann's training and experience, the trial court found Glanemann's testimony about Hobson having bloodshot eyes to be credible. (*Id.*, at p. 6). The trial court further found, based on a review of the evidence, the Hobson's speech was thick and slurred at various points during her encounter with the officers, noting that – for example – when Hobson called Patrolman Glanemann a "bitch", it came out as "bitchsh". (*Id.*, at p. 7).

{¶32} Our review of the trial court's findings of fact, based on the evidentiary record before the trial court, reflects that the lower court's findings are supported by competent, credible evidence and, therefore, we must accept those findings. *State v. Roberts*, *supra*, at ¶ 100.

{¶33} As required, we now turn to a de novo review of the application of the law to those facts. *Burnside*, *supra*, at ¶ 8.

**{¶34}** As the Supreme Court of Ohio has noted, "[i]n determining whether the police had probable cause to arrest an individual for [OVI], we consider whether, at the moment of arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence." *State v. Homan*, 89 Ohio St. 3d 421, 427 (2000), *superseded by statute on other grounds as stated in State v. Boczar,* 2007-Ohio-1251, ¶ 23, citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *State v. Timson*, 38 Ohio St.2d 122, 127 (1974). In making this determination, we examine the "totality" of facts and circumstances surrounding the arrest. *Id.*, citing *State v. Miller*, 117 Ohio App.3d 750, 761 (11th Dist. 1997); *State v. Brandenburg*, 41 Ohio App.3d 109, 111 (2d Dist. 1987).

**{¶35}** Circumstances from which an officer may derive cause to believe that a person was operating a vehicle while under the influence include, but are not limited to:

> (1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (e.g., whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent,

-18-

uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.

*State v. Schriml*, 2013-Ohio-2845, ¶ 26 (3d Dist.), quoting *State v. Evans*, 127 Ohio App.3d 56, 63, fn. 2 (11th Dist. 1998). "All of these factors, together with the officer's previous experience in dealing with [impaired] drivers, may be taken into account by a reviewing court in determining whether the officer acted reasonably. No single factor is determinative." *Id.*

{¶36} Applying those legal principles to the facts in this case, we conclude that the trial court did not err in rejecting Hobson's claim that the police lacked probable cause to arrest her for OVI.

{¶37} As the trial court accurately noted, Patrolman Glanemann was presented with the following circumstances in making the decision to arrest Hobson for OVI: a traffic accident having just occurred, it was 11:30 at night, Hobson's admission that she had been driving a vehicle involved in the accident, Hobson fleeing the scene of the accident and leaving behind her vehicle's bumper and grill, and Glanemann finding the vehicle parked in front of Hobson's home with its hazard lights on, with extensive damage and deployed airbags, with Hobson having driven the vehicle several blocks in that condition. Hobson was dismissive when asked by the police about the accident, was more interested in eating her chalupa than in

dealing with the rather serious matter at hand, and was agitated throughout the encounter with Glanemann and the other officers. Glanemann could smell the odor of alcohol on Hobson, and Hobson had glassy and bloodshot eyes. Hobson admitted to drinking that day, albeit claiming it had been much earlier. Hobson's speech was also thick and slurred at various times when speaking with the officers.

{¶38} Upon a review of the totality of the circumstances here, the record supports the trial court's conclusion that, drawn from the facts known to Glanemann at the time of the arrest, Glanemann and the other officers had probable cause to arrest Hobson for suspicion of OVI. Accordingly, the trial court did not err in denying the motion to suppress on that basis.

{¶39} The first assignment of error is overruled.

*Second and Third Assignments of Error*

{¶40} In the second assignment of error, Hobson argues that her conviction for OVI on Count 2 was not based on sufficient evidence. In the third assignment of error, Hobson argues that her conviction for OVI on Count 2 was against the manifest weight of the evidence.[2] As the second and third assignments of error both require a review of the evidence presented at trial in light of the statutory elements

---

[2] In these two assignments of error, Hobson actually asserts that her two OVI convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, respectively. However, as noted above, the trial court merged the two OVI convictions for sentencing purposes and, as a result, Hobson was only formally convicted and sentenced on the OVI in Count 2 of the indictment. Therefore, the OVI conviction on Count 2 is the only OVI conviction before this Court for review on appeal.

of the crime at issue, albeit with differing standards of review, we shall jointly address those assignments of error.

**{¶41}** It is well established that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶42}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus. Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. "'In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.'" *State v. Williams*, 2024-Ohio 2307, ¶ 21 (3d Dist.), quoting *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

**{¶43}** By contrast, when determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, *supra*, at 387. In doing so,

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must still allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

{¶44} In the instant case, Hobson was convicted on Count 2 of OVI in violation of R.C. 4511.19(A)(2), which provides:

> (A)(2) No person who, within twenty years of the conduct described in division (A)(2)(a) of this section, previously has been convicted of or pleaded guilty to a violation of this division, a violation of division (A)(1) of this section, or any other equivalent offense shall do both of the following:
>
> (a) Operate any vehicle, streetcar, or trackless trolley within this state while under the influence of alcohol, a drug of abuse, or a combination of them;
>
> (b) Subsequent to being arrested for operating the vehicle, streetcar, or trackless trolley as described in division (A)(2)(a) of this section,

being asked by a law enforcement officer to submit to a chemical test or tests under section 4511.191 of the Revised Code, and being advised by the officer in accordance with section 4511.192 of the Revised Code of the consequences of the person's refusal or submission to the test or tests, refuse to submit to the test or tests.

{¶45} As to the specific issue raised in the two assignments of error here, Hobson argues in the second assignment of error that the evidence at trial was insufficient to prove that she was impaired by alcohol while driving. Similarly, in the third assignment of error, Hobson asserts that her OVI conviction was against the manifest weight of the evidence as to the issue of whether she was impaired by alcohol while driving.

{¶46} Hobson does not dispute the fact that she had been driving after consuming alcohol. However, as Hobson notes in her merit brief, "'the law does not prohibit driving after drinking alcohol; instead, it prohibits driving when impaired by alcohol.'" *State v. Hopp*, 2016-Ohio-8027, ¶ 8 (9th Dist.). It is the requirement of impairment upon which Hobson bases her arguments in these assignments of error.

{¶47} In order for an appellate court to find that the evidence was sufficient to support a conviction for violating the general prohibition in R.C. 4511.19 against operating a vehicle while under the influence of alcohol, "the record must show that the State presented evidence that the defendant (1) was operating a 'vehicle, streetcar, or trackless trolley' (2) in the State of Ohio (3) while he or she was 'under

the influence of alcohol, a drug of abuse, or a combination of them.'" *State v. Sullivan*, 2017 Ohio-8937, ¶ 29 (3d Dist.). "In establishing the third element – that the defendant was under the influence of alcohol – the State 'need not establish a threshold level of alcohol concentration in the defendant's body. It must, however, prove that the defendant operated a vehicle when his faculties were appreciably impaired by the consumption of alcohol.'" *Sullivan*, at ¶ 30, quoting *State v. Lowman*, 82 Ohio App.3d 831, 836 (12th Dist. 1992). Put another way, "[t]o prove that a person is operating under the influence of alcohol within the meaning of R.C. 4511.19, the state must demonstrate that the defendant had consumed some alcohol in a quantity that had 'adversely and appreciably impair[ed] his actions or mental processes and depriv[ed] him of that clearness of intellect and control of himself which he would otherwise have had.'" *State v. Furguson*, 2013-Ohio-5388, ¶ 14 (1st Dist.), quoting *State v. Bakst*, 30 Ohio App.3d 141, 145 (1st Dist. 1986).

{¶48} In the case *sub judice*, this Court's review of the record reflects that the State of Ohio presented sufficient evidence at trial to establish that Hobson had operated her vehicle while appreciably impaired due to the consumption of alcohol. Several witnesses who interacted with Hobson that night believed her to be intoxicated, as compared to having merely ingested a minimal amount of alcohol. Hobson admitted to consuming an extremely potent alcoholic beverage. Hobson

had the smell of alcohol on her breath, with that odor of alcohol variously described by witnesses as "strong" and "overwhelming", and she exhibited slurred speech, as well as glassy and bloodshot eyes. Hobson's erratic, emotional, and hostile behavior both at the scene of the car crash and at her home immediately thereafter also supports the conclusion that she was impaired by alcohol at the time, as do the circumstances of the crash itself. There was evidence presented that Hobson was at fault in causing the collision, that she ran a red light at a high rate of speed, after also hitting several traffic cones that were marking the lanes of the roadway. Her decision to leave the scene of the accident was both irrational and illegal, and serves as a further indication of impaired judgment and actions. Finally, upon the evidence establishing that Hobson left the crash scene prior to the arrival of the police, while driving an extremely damaged vehicle to do so, a rational trier of fact could have reasonably concluded that Hobson fled the scene because she was afraid of getting caught while driving impaired.

{¶49} In sum, viewing all of the evidence in a light most favorable to the State of Ohio, a rational trier of fact could have reasonably concluded that all essential elements of the crime of OVI had been proven beyond a reasonable doubt. Accordingly, the second assignment of error is overruled.

{¶50} With respect to Hobson's manifest-weight claim in the third assignment of error, Hobson asserts that the greater weight of the evidence

-25-

established that she was not impaired while driving. In support of this claim, Hobson relies on evidence adduced at trial suggesting that not all of her behavior and actions was consistent with being impaired by alcohol, such as the fact that her vehicle was legally parked parallel to the curb when the officers arrived at her home, that she did not exhibit major problems with balance or coordination when interacting with the officers, and that she could eat without fumbling or dropping her food. Hobson also argues that the evidence did not establish that she was at fault in causing the crash, based on her claim made at the scene that the other vehicle ran a red light.

{¶51} However, while there was no evidence establishing that Hobson was falling-down drunk on the night in question, there was nonetheless rather overwhelming evidence that Hobson was appreciably impaired by alcohol and that she had been so while driving. The evidence summarized above, in our analysis of the second assignment of error, along with all other evidence of intoxication adduced during the trial, was not outweighed by the evidence upon which Hobson bases her argument here. Additionally, the prosecution presented several witnesses whose testimony, along with corroborating exhibits, served to establish that Hobson's erratic driving and running of a red light caused the collision, notwithstanding Hobson's claim to the contrary. A verdict is not against the manifest weight of the evidence just because the jury chose to believe the state's

Case No. 1-24-58

witnesses rather than the defendant's version of the events. *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.).

{¶52} Following this Court's independent review of the record and weighing of the evidence and all reasonable inferences therefrom, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction, nor is there any indication that the jury lost its way in finding Hobson guilty of OVI in Count 2. Accordingly, the third assignment of error is also overruled.

*Conclusion*

{¶53} Having found no error prejudicial to the defendant-appellant, Amy Hobson, in the particulars assigned and argued, the judgment of conviction and sentence entered in the Allen County Court of Common Pleas is affirmed.

***Judgment affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

Case No. 1-24-58

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge

_____
William R. Zimmerman, Judge

_____
Mark C. Miller, Judge

DATED:
/jlm

-28-